**ACTION et al., Percy Green, Defendant-Appellant,**

v.

**Rowland E. GANNON et al., Plaintiffs-Appellees.**

**No. 20182.**

United States Court of Appeals, Eighth Circuit.

Nov. 3, 1971.

Mehaffy, Circuit Judge, concurred and filed opinion.

Mortimer A. Rosecan, St. Louis, Mo., for appellant.

R. H. McRoberts, St. Louis, Mo., for appellees.

Before VAN OOSTERHOUT, ME-HAFFY, GIBSON, LAY, HEANEY and BRIGHT, Circuit Judges, En Banc.*

HEANEY, Circuit Judge.

We are asked to decide whether a United States District Court has jurisdiction to enjoin two organizations, the Black Liberation Front and Action, and their members,[1] from continuing to disrupt the religious services of a predominantly white Catholic parish.

The District Court, 303 F.Supp. 1240, found jurisdiction under 42 U.S.C. §§ 1981, 1982, 1983 and 1985(3), and their accompanying jurisdictional statutes, 28 U.S.C. §§ 1343(1), 1343(3) and 1343(4).

We hold that the District Court had jurisdiction under § 1985(3). We need not, therefore, determine whether it had jurisdiction under the other sections.[2]

The St. Louis Cathedral parish is a parish of the Roman Catholic Archdiocese of St. Louis. The plaintiffs are the pastor and members of the parish, and the Archbishop of St. Louis. The defendants are two voluntary unincorporated associations, Black Liberation Front and Action, and their members. The activities complained of were a series of demonstrations staged at the St. Louis Cathedral by Action.[3]

The first demonstration occurred on Sunday, June 8, 1969. Twenty-nine members of Action entered the cathedral during services, marched down the center aisle, and formed a line in front of the communion rail. Some of the demonstrators wore black Action sweatshirts, black trousers and black berets. Others were naked to the waist. One demonstrator, using an amplifier, read Action's "notice and demands" from a paper while others passed copies of the "notice and demands" to the congregation.[4] The

---

\* Chief Judge Matthes took no part in the consideration or decision of this appeal.

1. Only one defendant, Percy Green, Chairman of Action, has appealed. He was found to have conspired with the two organizations and their members to deprive the plaintiffs of the rights and privileges of citizens of the United States. Green has raised each of the issues we discuss in the opinion, and we must decide them. The relief which we grant, however, is limited to Green. Other defendants must make application to the District Court if they desire modification of the injunction.

2. We do note, however, that jurisdiction under § 1983 is doubtful. See, Adickes v. S. H. Kress & Co., 398 U.S. 144, 166, 90 S.Ct. 1598, 26 L.Ed.2d 142 (1970), in which the Supreme Court characterized the opinion of the District Court finding § 1983 jurisdiction in this case as "exceedingly opaque"; 38 U.Cin.L. Rev. 761 (1969); 23 Vand.L.Rev. 413 (1970).

3. Black Liberation Front did not directly participate in the demonstrations involved

in this lawsuit. However, the District Court held that Black Liberation Front was in conspiracy with Action because it knew of, took part in, and helped plan the concerted demonstrations against many churches in the area.

4. "ACTION'S TO:
 NOTICE
"THE PUBLIC ..............
"THE LUTHERAN CHURCHES, VIA PRESIDENT REV. DR. OLIVER HARMS
"THE EPISCOPAL CHURCHES, VIA BISHOP GEORGE CADIGAN, and
"THE ROMAN CATHOLIC CHURCHES, VIA CARDINAL JOHN CARBERRY.
"Ladies and Gentlemen of the church, ACTION's 'BLACK SUNDAYS', phase two, are series of protest demonstrations against the above church denominations. The demonstrations will last for a period of six months.
"If you wish *not* to become invoved, it would be best that you take a six month leave-of-absence from the church. AC-TION's 'BLACK SUNDAYS' at this church will take place *without further*

demonstrators then left. The "notice and demands" warned the parishioners that a series of protest demonstrations would take place over the next six months unless certain demands were met.

On Sunday, June 15, several members of Action gathered across the street from the cathedral. Some of the members entered the cathedral. One, Mrs. Ernestine Lloyd, approached the lectern during the service and requested permission to speak for five minutes. When permission was denied, Mrs. Lloyd began reading the "demands" until ushers seized the paper. At the close of the service, Mrs. Lloyd sat down in the vestibule of the church and refused to move. She was forcibly removed by St. Louis police.

On June 29, eight or nine members of Action entered the cathedral prior to the noon service. They went directly to the communion rail and sat down, blocking the area where the service was to be held. The service was then cancelled.

On Sunday, July 6, about eighteen members of Action came to the cathedral and remained just outside while five of their number went inside. One of the demonstrators, dressed in a long black robe and wearing a triangular hat resembling a bishop's mitre, walked down the center aisle to the front of the church carrying a sign worded: "Carberry [the Archbishop of St. Louis] makes a mockery of the real church." When he reached the communion rail, he turned and walked back to the rear of the church, chanting "Racists, racists—white Christian racists." An altercation followed, and members of the St. Louis police force removed the demonstrators.

Following a full hearing, at which the above facts were established, the District Court concluded:

"* * * that a permanent injunction should issue because defendants will continue to disrupt, interrupt and disturb the worship services and meetings of the Cathedral parish of the Diocese of St. Louis, and will deprive the plaintiffs and parishioners of said parish of their Constitutional and civil rights to exercise freedom of religion, freedom of speech, freedom of assembly and the same right, as enjoyed by other citizens of the United States, to

---

*warning*. If you're present, of course, you'll become involved ———————— a very shocking experience!

" 'BLACK SUNDAYS', phase two, will take on various forms of uniqueness, such as 'spitting in the communion cup during communion service, a symbollic (sic) gesture of changing wine back to water and/or taking the holy bread from the Reverend and distributing it to the Black *poor*.

"ACTION, an interracial human rights organization, which means our white members will be participating in all demonstrations, in all parts of the city and county.

"ACTION DEMANDS:

"1. ACTION demands that all properties, including slum property be made public.

"2. ACTION demands that the property owner (the church superior staff) make itself available to act as a non-profit bonding agency for all Black residents of St. Louis.

"3. ACTION demands that Harms, Cadigan and Carberry place all police officers of their respective religious jurisdiction, guilty of firing at Black fleeing suspects, wounding or killing a Black fleeing suspect, under disciplinary action of the church and make it *public*.

"4. ACTION demands the removal of all investments from Laclede Gas, Union Electric, Southwestern Bell & McDonnel-Douglas Corp. These firms have consistently refised (sic) to hire and up-grade the Black man into the better paying jobs.

"5. ACTION demands 75% of the 'monies take', annually, to be relinquished to ACTION for the purpose of financing energetic community base programs that are actively combating white racism in other areas, regardless of creed.

"6. ACTION demands that in support of public housing rent strikers, the Rev. John Shocklee be asked to resign his position from the St. Louis Housing Authority Board of Commissioners and that Harms, Cadigan & Carberry request a Black male rent strike tenant to be selected by the rent strike leaders to replace Father Shocklee.

"ACTION'S 'BLACK SUNDAYS' DEMONSTRATIONS WILL CEASE WHEN ALL DEMANDS ARE MET!!!!!"

hold and use the parish property for religious purposes unless restrained by order of this Court and that irreparable injury, loss and damage will result to plaintiffs and parishioners of the Cathedral parish."

This appeal followed. The defendants urge that the District Court had no jurisdiction under § 1985(3) because that section does not provide a civil remedy for wholly private conspiratorial acts.

We consider, first, whether § 1985(3) is to be construed to give the federal courts jurisdiction over this conspiracy. We hold that it is to be so construed. Second, we consider whether a constitutional source of power to reach this conspiracy exists.[5] We hold that it does. Third, we consider whether injunctive relief is available under § 1985(3), and hold that it is. Finally, we consider the scope of the injunction and hold that it is too broad.

## I. THE STATUTORY CONSTRUCTION QUESTION

Section 1985(3) provides:

"If two or more persons in any State * * * conspire or go in disguise * * * on the premises of another, for the purpose of depriving, either directly or indirectly, any person or class of persons of the equal protection of the laws, or of equal privileges and immunities under the laws; * * * in any case of conspiracy set forth in this section, if one or more persons engaged therein do, or cause to be done, any act in furtherance of the object of such conspiracy, whereby another is injured in his person or property, or deprived of having and exercising any right or privilege of a citizen of the United States, the party so injured or deprived may have an action for the recovery of damages, occasioned by such injury or deprivation, against any one or more of the conspirators."

At the time of oral argument, the conclusion that the District Court had jurisdiction under § 1985(3) might have appeared to be foreclosed by Collins v. Hardyman, 341 U.S. 651, 71 S.Ct. 937, 95 L.Ed. 1253 (1951). Since that date, however, the Supreme Court has held that § 1985(3) reaches private conspiracies aimed at depriving others of the equal enjoyment of rights secured by the Constitution to all. Griffin v. Breckenridge, 403 U.S. 88, 102, 91 S.Ct. 1790, 29 L.Ed.2d 338 (1971). *Griffin* squarely answered the contention, also raised here, that § 1985(3) was not intended to reach private conspiracies. The Court reasoned:

(1) That the statute, on its face, fully encompasses the conduct of private persons, since its provisions speak simply of "two or more persons in any State or Territory" who conspire or go in disguise on the highway or on the premises of another.

(2) That the approach of the Court since *Collins* has been to accord Reconstruction civil rights statutes "a sweep as broad as their language."

(3) That examination of companion statutory provisions reinforces the view that § 1985(3) applies to private conspiracies.

(4) That the legislative history of the section indicates a congressional intent to impose liability for purely private conspiracies.

■ *Griffin* makes it clear that § 1985(3) is not intended to cover all conspiracies to interfere with the rights of others. We must, therefore, determine whether that section is applicable to the conspiracy in this case.

The Court in *Griffin* stated that:

" * * * though the supporters of the legislation insisted on coverage of private conspiracies, they were equally emphatic that they did not believe, in the words of Representative Cook,

5. We feel obliged to discuss the constitutionality of § 1985(3) because the Supreme Court, in Griffin v. Breckenridge, 403 U.S. 88, 91 S.Ct. 1790, 29 L.Ed.2d 338 (1971), specifically raised the question of Congress's constitutional power to reach private conspiracies under the Fourteenth Amendment.

'that Congress has a right to punish an assault and battery when committed by two or more persons within a State.' Id., at 485. The constitutional shoals that would lie in the path of interpreting § 1985(3) as a general federal tort law can be avoided by giving full effect to the congressional purpose—by requiring, as an element of the cause of action, the kind of invidiously discriminatory motivation stressed by the sponsors of the limiting amendment. * * * The language requiring intent to deprive of *equal* protection, or *equal* privileges and immunities, means that there must be some racial, or perhaps otherwise class-based, invidiously discriminatory animus behind the conspirators' action. * * * " (Emphasis included.)

*Id.* at 101–102, 91 S.Ct. at 1798.

It seems clear from the facts in this case that the defendants were stimulated to disrupt the church services by racial and economic motives. The defendants purported to act on behalf of the black citizens of St. Louis, Missouri. Some of their demands would have required the church to withdraw its money from investments in companies whose policies Action viewed as detrimental to blacks. Other demands would have required the church to devote substantial portions of its income to programs dedicated to black advancement. Action made these demands to a predominantly white parish. It made these same demands to other white churches throughout St. Louis. The premise underlying the selection of Action's targets is that these churches have substantial amounts of money, the use of which Action hoped to control for the benefit of economically deprived black people.

 Our conclusion that § 1985(3) encompasses this conspiracy does not detract from the defendants' own First Amendment rights. The gravamen of the complaint is that the defendants disrupted the plaintiffs' religious services, not that they had merely been obnoxious or unsettling in exercising their own rights.

 The defendants have a right to voice their opinion that the plaintiffs have not fulfilled their obligation to the black community. The defendants also have a right to make requests upon the plaintiffs if such requests are not joined with threats to disrupt church services and are not otherwise unlawful. The fact that the requests or opinions may be offensive to the parishioners does not render them outside the protection of the First Amendment. Organization for a Better Austin v. Keefe, 402 U.S. 415, 91 S.Ct. 1575, 29 L.Ed.2d 1 (1971); Bachellar v. Maryland, 397 U.S. 564, 90 S.Ct. 1312, 25 L.Ed.2d 570 (1970); Street v. New York, 394 U.S. 576, 89 S.Ct. 1354, 22 L.Ed.2d 572 (1969). As the Supreme Court has said:

" * * * [A] function of free speech under our system of government is to invite dispute. It may indeed best serve its high purpose when it induces a condition of unrest, creates dissatisfaction with conditions as they are, or even stirs people to anger. Speech is often provocative and challenging. It may strike at prejudices and preconceptions and have profound unsettling effects as it presses for acceptance of an idea. That is why freedom of speech, though not absolute, * * * is nevertheless protected against censorship or punishment, unless shown likely to produce a clear and present danger of a serious substantive evil that rises far above public inconvenience, annoyance, or unrest. * * * "

Terminiello v. Chicago, 337 U.S. 1, 4, 69 S.Ct. 894, 896, 93 L.Ed. 1131 (1949).

 The defendants also have a right to engage in peaceful pamphleteering and picketing on public property,[6] so long

---

6. Organization for a Better Austin v. Keefe, 402 U.S. 415, 91 S.Ct. 1575, 29 L.Ed.2d 1 (1971); Gregory v. Chicago, 394 U.S. 111, 89 S.Ct. 946, 22 L.Ed.2d 134 (1969); Cox v. Louisiana, 379 U.S. 536, 85 S.Ct. 453, 13 L.Ed.2d 471 (1965); Edwards v. South Carolina, 372 U.S. 229, 83 S.Ct. 680, 9 L.Ed.2d 697 (1963).

as they do not "unduly interfere with the normal use of the public property by other members of the public with an equal right of access to it," Amalgamated Food Employees Union Local 590 v. Logan Valley Plaza, Inc., 391 U.S. 308, 320, 88 S.Ct. 1601, 1609, 20 L.Ed.2d 603 (1968), and cases cited therein, provided, of course, that they do not interfere with those entering or leaving the church.

■ The defendants, however, do not have a right to enter the cathedral and disrupt the church services of the plaintiffs. Such disruption is an intolerable violation of the rights of those engaged in worship. See, Gregory v. Chicago, 394 U.S. 111, 125, 89 S.Ct. 946, 22 L.Ed. 2d 134 (1969) (concurring opinion of Mr. Justice Black, joined by Mr. Justice Douglas).

## II. THE CONSTITUTIONAL QUESTION

*Griffin* did not resolve the question of whether § 1985(3) can be constitutionally applied to the facts of this case. *Griffin* teaches (1) that we need not find the language of § 1985(3) constitutional in all its possible applications in order to uphold its facial constitutionality and its application to the facts of a particular case; (2) that § 1985(3) is not unconstitutional solely on the grounds that it reaches wholly private conspiracies; and (3) that a source of congressional power to reach the private conspiracy must be found in each case.

In *Griffin*, the Court found the source of power in the Thirteenth Amendment and in those sections of the Constitution which protect a citizen's right to travel interstate.[7]

The Court concluded its opinion by stating:

"In identifying these two constitutional sources of congressional power, we do not imply the absence of any other. More specifically, the allegations of the complaint in this case have not required consideration of the scope of the power of Congress under § 5 of the Fourteenth Amendment. * * * "

*Id.* 403 U.S. at 107, 91 S.Ct. at 1801.

It is quite clear that neither the Thirteenth Amendment nor the constitutional right to travel interstate can serve as a source of power here. But we think it equally clear that Congress had power to reach this conspiracy under §§ 1 and 5 of the Fourteenth Amendment.

We must answer two questions in order to reach this result: (1) Does the Fourteenth Amendment protect the First Amendment rights involved here, and (2) if so, does it protect those rights against state action only or against private actions as well?

Volumes have been written on the question of whether § 1 of the Fourteenth Amendment protects all rights guaranteed by the first eight Amendments to the Constitution.[8] Mr. Justice

---

7. When courts have had occasion to ascribe the source of the right of interstate travel to a particular constitutional provision, they have relied either on the commerce clause, the privileges and immunities clause of Article IV, § 2, or on § 1 of the Fourteenth Amendment. See Shapiro v. Thompson, 394 U.S. 618, 630, n. 8, 89 S.Ct. 1322, 22 L.Ed.2d 600 (1969), and the cases cited therein.

8. The following authors generally support the view that all or most of the rights guaranteed by the Bill of Rights can be protected against private invasion through the power granted to Congress by §§ 1 and 5 of the Fourteenth Amendment: H. Flack, The Adoption of the Four-

teenth Amendment (1908); R. J. Harris, The Quest for Equality (1960); J. ten Broek, the Anti-Slavery Origins of the Fourteenth Amendment (1951); Crosskey, Charles Fairman, "Legislative History," and the Constitutional Limitations on State Authority, 22 U.Chi.L.Rev. 1 (1954); Frank and Munro, The Original Understanding of "Equal Protection of the Laws," 50 Colum.L.Rev. 131 (1950); Theories of Federalism and Civil Rights, 75 Yale L.J. 1007, 1048 (1966).

Authorities expressing a *contrary view* include Avins, The Ku Klux Klan Act of 1871: Some Reflected Light on State Action and the Fourteenth Amendment, 11 St. Louis U.L.J. 331 (1967); Fairman, Does the Fourteenth Amendment

Black, until his recent death, spoke for a strong minority of the Court in arguing the affirmative of the issue. His dissent in Adamson v. California, 332 U.S. 46, 67 S.Ct. 1672, 91 L.Ed. 1903 (1946), reflects the views of the minority:

> "My study of the historical events that culminated in the Fourteenth Amendment, and the expressions of those who sponsored and favored, as well as those who opposed its submission and passage, persuades me that one of the chief objects that the provisions of the Amendment's first section, separately, and as a whole, were intended to accomplish was to make the Bill of Rights, applicable to the states. With full knowledge of the import of the Barron decision [Barron, for Use of Tiernan v. The Mayor and City Council of Baltimore, 32 U.S. (7 Pet.) 243, 8 L.Ed. 672 (1833)], the framers and backers of the Fourteenth Amendment proclaimed its purpose to be to overturn the constitutional rule that case had announced. * * *
>
> * * * * * *
>
> "I cannot consider the Bill of Rights to be an outworn 18th Century 'straight jacket' as the Twining opinion [Twining v. New Jersey, 211 U.S. 78, 29 S.Ct. 14, 53 L.Ed 97 (1908)] did. Its provisions may be thought outdated abstractions by some. And it is true that they were designed to meet ancient evils. But they are the same kind of human evils that have emerged from century to century wherever excessive power is sought by the few at the expense of the many. In my judgment the people of no nation can lose their liberty so long as a Bill of Rights like ours survives and its basic purposes are conscientiously interpreted, enforced and respected so as to afford continuous protection against old, as well as new, devices and practices which might thwart those purposes. * * * If the choice must be between the selective process of the Palko decision [Palko v. Connecticut, 302 U.S. 319, 58 S.Ct. 149, 82 L.Ed. 288 (1937)] applying some of the Bill of Rights to the States, or the Twining rule applying none of them, I would choose the Palko selective process. But rather than accept either of these choices, I would follow what I believe was the original purpose of the Fourteenth Amendment—to extend to all the people of the nation the complete protection of the Bill of Rights. * * * *"

*Id.* at 71–72, 89, 67 S.Ct. at 1686, 1695.

A majority of the Court has consistently refused to accept Mr. Justice Black's viewpoint, choosing instead to apply the Bill of Rights to the States on a selective basis. In this process, the Court has made it clear that First Amendment rights are protected by § 1 of the Fourteenth Amendment.[9]

▆ Under these circumstances, we have no difficulty in concluding that the Fourteenth Amendment protects the

---

Incorporate the Bill of Rights? The Original Understanding, 2 Stan.L.Rev. 5 (1949) ; Morrison, Does the Fourteenth Amendment Incorporate the Bill of Rights? The Judicial Interpretation, 2 Stan.L.Rev. 140 (1949). Morrison, however, states that the Supreme Court has been unanimous for some years in holding that the First Amendment is incorporated into the Fourteenth Amendment.

Authors expressing other views include Bickel, The Original Understanding and the Segregation Decision, 69 Harv.L.Rev. 1 (1955) ; Peters, Civil Rights and State Non-Action, 34 Notre Dame Law 303 (1959).

9. See, for instance, New York Times Co. v. Sullivan, 376 U.S. 254, 276, 277, 84 S.Ct. 710, 11 L.Ed.2d 686 (1964), and the cases stated therein; Louisiana ex rel. Gremillion v. N.A.A.C.P., 366 U.S. 293, 81 S.Ct. 1333, 6 L.Ed.2d 301 (1961) ; Shelton v. Tucker, 364 U.S. 479, 81 S.Ct. 247, 5 L.Ed.2d 231 (1960) ; Staub v. Baxley, 355 U.S. 313, 78 S.Ct. 277, 2 L.Ed.2d 302 (1958) ; Cantwell v. Connecticut, 310 U.S. 296, 60 S.Ct. 900, 84 L.Ed. 1213 (1940) ; Lovell v. Griffin, 303 U.S. 444, 58 S.Ct. 666, 82 L.Ed. 949 (1938) ; De Jonge v. Oregon, 299 U.S. 353, 57 S.Ct. 255, 81 L.Ed. 278 (1937) ; Grosjean v. American Press Co., 297 U.S. 233, 56 S.Ct. 444, 80 L.Ed. 660 (1936).

plaintiffs' First Amendment rights of freedom of assembly and worship.

■ We turn then to the second question: whether the rights are protected only against State action. We think not. We believe that Congress was given the power in § 5 of the Fourteenth Amendment to enforce the rights guaranteed by the Amendment against private conspiracies.

We reach this conclusion with some trepidation because a number of decisions of the Supreme Court, during and shortly after the Reconstruction period,[10] are frequently quoted as laying down the unqualified rule that "if federal civil rights legislation is directed at merely 'private acts,'" it must be denounced as unauthorized by the Fourteenth Amendment and hence unconstitutional unless some alternative constitutional authority for it can be established.[11]

Notwithstanding these early decisions, we feel that the 1966 decision of the United States Supreme Court in United States v. Guest, 383 U.S. 745, 86 S.Ct. 1170, 16 L.Ed.2d 239, requires that we sustain the exercise of constitutional power here. We believe, in doing so, we reach the result intended by the sponsors of the Fourteenth Amendment.[12]

In *Guest,* six Justices—Warren, Black, Douglas, Clark, Brennan and Fortas—expressed the view that Congress has power under § 5 of the Fourteenth Amendment to punish private conspiracies that interfere with Fourteenth Amendment rights. Mr. Justice Clark, speaking on behalf of himself and Justices Black and Fortas, stated:

"* * * [I]t is, I believe, both appropriate and necessary under the circumstances here to say that there now can be no doubt that the specific language of § 5 empowers the Congress to enact laws punishing all conspiracies—with or without state action—that interfere with Fourteenth Amendment rights."

*Id.* at 762, 86 S.Ct. at 1180.

Mr. Justice Brennan, speaking on behalf of the Chief Justice and Mr. Justice Douglas, stated:

"A majority of the members of the Court expresses the view today that § 5 empowers Congress to enact laws punishing *all* conspiracies to interfere with the exercise of Fourteenth Amendment rights, whether or not state officers or others acting under the color of state law are implicated in the conspiracy. Although the Fourteenth Amendment itself, according to established doctrine, 'speaks to the State or to those acting under the color of its authority,' legislation protecting rights created by that Amendment, such as the right to equal utilization of state facilities, need not be confined to punishing conspiracies in which state officers participate. Rather, § 5 authorizes Congress to make laws that it concludes are reasonably necessary to protect a right created

10. Twining v. New Jersey, 211 U.S. 78, 29 S.Ct. 14, 53 L.Ed. 97 (1908); Maxwell v. Dow, 176 U.S. 581, 20 S.Ct. 494, 44 L.Ed. 597 (1900); Civil Rights Cases, 109 U.S. 3, 3 S.Ct. 18, 27 L.Ed. 835 (1883); United States v. Harris, 106 U.S. 629, 1 S.Ct. 601, 27 L.Ed. 290 (1883); United States v. Cruikshank, 92 U.S. 542, 23 L.Ed. 588 (1876).

11. See, Frantz, Congressional Power to Enforce the Fourteenth Amendment Against Private Acts, 73 Yale L.J. 1353 (1964).

12. The pertinent provisions of the Fourteenth Amendment are set out here: "Section 1. All persons born or naturalized in the United States, and subject to the jurisdiction thereof, are citizens of the United States and of the State wherein they reside. No State shall make or enforce any law which shall abridge the privileges or immunities of citizens of the United States; nor shall any State deprive any person of life, liberty, or property, without due process of law; nor deny to any person within its jurisdiction the equal protection of the laws.

\* \* \* \* \*

"Section 5. The Congress shall have power to enforce, by appropriate legislation, the provisions of this article."

by and arising under that Amendment; and Congress is thus fully empowered to determine that punishment of private conspiracies interfering with the exercise of such a right is necessary to its full protection. * * * "I acknowledge that some of the decisions of this Court, most notably an aspect of the Civil Rights cases, * * * have declared that Congress' power under § 5 is confined to the adoption of 'appropriate legislation for correcting the effects of . . . prohibited State laws and State acts, and thus to render them effectually null, void, and innocuous.' I do not accept—and a majority of the Court today rejects—this interpretation of § 5. * * *

\* \* \* \* \* \*

"Viewed in its proper perspective, § 5 of the Fourteenth Amendment appears as a positive grant of legislative power, authorizing Congress to exercise its discretion in fashioning remedies to achieve civil and political equality for all citizens. * * * " [13] *Id.* at 782–784, 86 S.Ct. at 1191, 1192.

While the Court in *Griffin* left the door open for a reexamination of *Guest*, we do not believe that it will reject the majority views expressed therein. The Fourteenth Amendment and § 1985(3), construed in *Griffin,* are too closely related with respect to date of passage, authorship, and purpose to permit such a result with consistency.

Furthermore, the Court's decisions in a number of recent cases reveal a purpose to protect the constitutional rights of citizens against private invasion by expanding the concept of State action to situations where the showing of such action would, at another time, have been considered insufficient.[14]

The legislative history of the Fourteenth Amendment with reference to this problem has been examined and reexamined by legal scholars.[15] Their studies

13. For a discussion of United States v. Guest, 383 U.S. 745, 86 S.Ct. 1170, 16 L.Ed.2d 239 (1966), see: Avins, The Ku Klux Klan Act of 1871, Some Reflected Light on State Action and the Fourteenth Amendment, *supra;* Feurstein, Civil Rights Crimes and the Federal Power to Punish Private Individuals for Interference with Federally Secured Rights, 19 Vand.L.Rev. 641, 673 (1966); Niles, Civil Actions for Damages Under the Federal Civil Rights Statutes, 45 Texas L.Rev. 1015 (1967); Theories of Federalism and Civil Rights, *supra* at 1046–1049; Notes, Fourteenth Amendment Congressional Power to Legislate Against Private Discriminations: The Guest Case, 52 Cornell L.Rev. 586 (1967).

14. See, Adickes v. S. H. Kress & Co., *supra;* Sullivan v. Little Hunting Park, Inc., 396 U.S. 229, 90 S.Ct. 400, 24 L.Ed. 2d 386 (1969); United States v. Johnson, 390 U.S. 563, 88 S.Ct. 1231, 20 L.Ed.2d 132 (1968).

15. See generally, Federal Civil Action Against Private Individuals for Crimes Involving Civil Rights, 74 Yale L.J. 1462, 1469, 1470 (1965); Frank and Munro, *supra note* 8, at 165, in which the authors state:
 " * * * By their words and votes, a decided majority of the members of Congress in 1871 recorded their opinion that a State denied equal protection of the laws when it tolerated widespread abuses against a class of citizens because of their color without seriously attempting to protect them by enforcing the law. * * * ";
and J. tenBroek, *supra note* 8, at 217, in which the author states:
 "While section I of the Fourteenth Amendment was thus declaratory and confirmatory, section 5 corrected the one great constitutional defect, the one pressing want which years of systematic violation of men's natural rights have demonstrated. It gave Congress power to protect those rights. The violations and denials most often mentioned were, of course, those occurring under state laws and carried on by state officials. These were the sources, the perpetrators, of flagrant, commonly observed, and systematic invasions of those rights. But the absence of and need for protection against private invasions were adverted to almost as frequently."
*Contra,* see Avins, *supra note* 8, at 381. There the author states that *Guest* adopted
 " * * * the precise theory which in 1871 was disavowed by every Republican who voted for the fourteenth amendment and addressed himself to the point and by every other Republican, with the possible exception of Representative

have been far more comprehensive than we can make here. Our study of their dissertations convinces us that Flack was correct when he stated:

" * * * [A]ccording to the purpose and intention of the Amendment as disclosed in the debates in Congress and in the several state Legislatures and in other ways, Congress had the constitutional power to enact direct legislation to secure the rights of citizens against violation by individuals as well as by States."

H. Flack, The Adoption of the Fourteenth Amendment, at 277 (1908).

This interpretation of the Amendment would leave to Congress the question of the extent to which it desired to exercise its power under the Amendment subject, of course, to the limitation previously expressed in this opinion that it can only exercise its power with respect to rights protected by the Fourteenth Amendment. In doing so, we may, in the words of the author of a treatise on the question,

" * * * be pardoned for suspecting that the framers of the fourteenth amendment * * * would have been far more astonished by the powers later exercised by the judiciary under the fourteenth amendment than by an assertion that the amendment empowers Congress to enact * * * a statute to punish racially-motivated acts of private intimidation."

Frantz, Congressional Power to Enforce the Fourteenth Amendment Against Private Acts, 73 Yale L.J. 1353, 1383 (1964).

## III. THE PROPRIETY OF INJUNCTIVE RELIEF

On its face, § 1985(3) provides only for an award of damages for violation of civil rights. The District Court, however, held that it had jurisdiction to grant injunctive relief. We believe the District Court was correct.

The Fifth Circuit alone has squarely considered the issue of the availability of injunctive relief under § 1985(3). Mizell v. North Broward Hospital District, 427 F.2d 468 (1970). In that case the plaintiff, charging racial discrimination, brought suit against the defendant under §§ 1981, 1982 and 1985(3) for its action in suspending his right to practice medicine in any hospital within the district. He sought both damages and injunctive relief. Although the case was on appeal on an unrelated question, the Fifth Circuit, in dicta, dealt with the question before us. It concluded that § 1985(3) afforded a basis for injunctive relief, stating:

" * * * [The District Court's] statement [that § 1985(3) provides only for damages] * * * seems clearly to express [its] view that it would be powerless to enter an injunction in the event the plaintiff's proof showed he was otherwise entitled to it. We think that the Supreme Court's decision in Jones v. [Alfred H.] Mayer Co., 392 U.S. 409, 88 S.Ct. 2186, 20 L. Ed.2d 1189] also resolved this issue. As we have pointed out above, Section 1982, which was before the court for consideration, gave no authority for the granting of an injunction or the granting of damages. Nevertheless the court held that both powers would be available to a court upon proof of facts bringing the plaintiff within the terms of the Civil Rights Act there involved. We think the same power is available to a trial court in an action brought under Section 1985, even though that section refers in precise terms only to a suit for damages. As the court said [in *Jones*], 'The fact that 42 U.S.C. § 1982 is couched in declaratory terms and provides no ex-

---

Shanks, as being clearly in excess of Congress' power under the amendment. * * * "

Avins notes, however, that he made this same argument to the Supreme Court in 1966 in Katzenbach v. Morgan, 384 U.S.

641, 86 S.Ct. 1717, 16 L.Ed.2d 828. Avins, *supra note* 8, n. 249, at 381. We can thus be reasonably assured that the Justices were aware of the author's point of view when they decided *Guest*.

plicit method of enforcement does not, of course, prevent a federal court from fashioning an effective equitable remedy * * *.' "

*Id.* at 473.

This Court, in Brewer v. Hoxie School District No. 46, 238 F.2d 91 (8th Cir. 1956), held that the District Court had the power to issue an injunction against individuals attempting to interfere with the plaintiff school district's efforts to integrate its schools in accordance with Brown v. Board of Education of Topeka.[16] The school district had brought its action under several sections in addition to § 1985(3), some of which permit injunctive relief. Even so, we believe that the rationale of *Brewer* is applicable to the case before us. We stated there that:

" * * * jurisdiction of the federal courts to issue injunction to protect rights safeguarded by the Constitution is well established. * * * Federal courts have the power to afford all remedies necessary to the vindication of federal substantive rights defined in statutory and constitutional provisions except where Congress has explicitly indicated that such remedy is not available."

238 F.2d at 98.

There is no explicit language in § 1985 (3) to preclude the District Court from issuing an injunction to protect constitutional rights.

We view this result as being in accord with the principle enunciated in Bell v. Hood, 327 U.S. 678, 66 S.Ct. 773, 90 L. Ed. 939 (1946), that:

" * * * where federally protected rights have been invaded, it has been the rule from the beginning that courts will be alert to adjust their remedies so as to grant the necessary relief. And it is also well settled that where legal rights have been invaded, and a federal statute provides for a general right to sue for such invasion, federal courts may use any available remedy to make good the wrong done."

*Id.*, at 684, 66 S.Ct. at 777.

## IV. THE SCOPE OF THE INJUNCTION

■ The plaintiffs were clearly entitled to injunctive relief because the evidence established that the defendants had disrupted religious services at the cathedral and that they would continue to do so unless enjoined. The District Court had discretion in framing an injunction, but this discretion did not extend to depriving the defendants of their First Amendment rights. Our examination of the injunction convinces us that some of its sections do operate to deprive the defendants of First Amendment rights, particularly parts of sections a and d. These sections should be modified to read as shown in the footnote.[17]

The District Court is directed to revise the injunction consistent with the views expressed in Section I, pp. 1231–1233 of this opinion.

## SUMMARY

The decision of the District Court is affirmed insofar as it grants injunctive relief to the plaintiffs. The matter is, however, remanded to the District Court with instructions to revise the permanent injunction in a manner consistent with the views expressed herein.

We express our appreciation to Court-appointed counsel, Mortimer A. Rosecan, for the excellent brief filed by him in behalf of the appellant.

16. Brown v. Board of Education of Topeka, 347 U.S. 483, 74 S.Ct. 686, 98 L.Ed. 873 (1954).

17. The following paragraphs are to be revised to read as follows:
"a. Entering upon the premises of the St. Louis Cathedral at Lindell Boulevard and Newstead Avenue in the City of St. Louis, Missouri, except for the purpose of peacefully participating in religious services or meetings;
* * * * *
"d. Threatening plaintiffs or any members of said parish with respect to their attendance at services or meetings in said Cathedral; * * *."

MEHAFFY, Circuit Judge (concurring).

The result in this case is compelled by Griffin v. Breckenridge, 403 U.S. 88, 91 S.Ct. 1790, 29 L.Ed.2d 338 (1971), since it is entirely clear that the defendants disrupted the church services and in so doing there was racial invidious discriminatory animus behind the conspirators' action. I therefore abide that mandate and concur in the result. However, I do not agree with the logic of the majority opinion in reaching this result as it involves an expansion of the reach of the Fourteenth Amendment. I would rest the decision solely on Griffin v. Breckenridge, *supra*.

Skelton, Judge, Court of Claims, filed opinion concurring in part and dissenting in part.