BRIGHT, Circuit Judge,
dissenting.
If speech is silver, silence may be golden. For its part, the United States Supreme Court wrote in favor of silence in Frisby v. Schultz, 487 U.S. 474, 108 S.Ct. 2495, 101 L.Ed.2d 420 (1988). There, by finding the protection of residential privacy to be a substantial government interest, the Court shielded residents from unwanted speech in their homes. The present case raises a similar question; namely, whether an analogous principle of religious freedom applies to churchgoers, and whether the government may reasonably protect those who attend religious rites and observances at the church of their choice from unwanted messages. The answer should be a resounding yes.
I. BACKGROUND
I amplify the factual background, some of which has already been stated in the majority opinion.
In 1998, the City Council of Lincoln, Nebraska held a public hearing to consider the adoption of an ordinance prohibiting certain picketing at religious services and activities. For approximately a year and a half, picketers had been demonstrating outside the Westminster Presbyterian Church in Lincoln (“Westminster”). The protests occurred at the entrances, exits, and parking lot of Westminster’s building. The picketers protested against abortions performed by Dr. Winston Crabb, an obstetrician/gynecologist and an elder and deacon of the church. At the hearing, many church members testified that recent picketing outside their church had become disruptive and was preventing them from peaceably attending church.
An associate pastor at Westminster testified that “[f]ive to six foot images of decapitations and mutilations are held in [parishioners’] faces, placed against their *1183 family vehicles, and directed at them at a close range .... Statements about [fetuses] being murdered, killed, and butchered by a member of their church [Dr. Crabb] are shouted at them as they enter the church building.” J.A. at 117.
Westminster members testified that their families, and especially young children, have undergone emotional distress because of the picketing. One nine-year-old member testified at the City Council hearing that “[t]his lady stuck a bloody baby picture right in my face and she was about two to three feet away. My tummy was queasy and it was horrifying. I have had some bad times in my life, but that time was the worst ever.” Id. at 122. Several churchgoers testified that their children experienced nightmares, frequent crying, and a negative shift in attitude towards church in general. See id. at 123. Psychologists testified that the children of Westminster were the most vulnerable to the picketers’ signs and shouting. One psychologist stated the following:
Frankly, I was shocked by the atmosphere I encountered as I drove around the church. There was a siege like atmosphere with protestors strategically positioned around the church.... I had no idea the posters were so large or that the pictures were so graphic. The images on the poster are truly the images of nightmares.... As an expert in anxiety, I have little doubt that the experience of attending church at Westminster is highly stressful.
Id. at 130-31.
In some instances, members have taken dramatic measures to avoid the demonstrators. According to one church member, “Our six year old niece was forced to ride on the floorboard of her car for protection while arriving for the service.” Id. at 130. While some have done their best to circumvent the demonstrations, some have left the church because of the picketing. See id. at 123.
The Lincoln City Council ultimately enacted an ordinance that banned focused picketing on the sidewalks and entryways adjoining religious premises. The ban is effective thirty minutes before and thirty minutes after any scheduled religious activity. The purpose of Lincoln’s ordinance was to “preserve the peace at religious premises .... ” J.A. at 173. In addition, the Lincoln City Council believed that picketing in such a “time, place and manner as to disrupt religious activities or to hinder reasonable access to them by families with young children, disturbs the peace essential to individuals who wish to participate in such religious activities .... ” Id. The City Council made several additional findings:
infants and young children are emotionally vulnerable to focused picketing in close proximity to them, which is a typical characteristic of focused picketing at religious premises, and many of these children tend to react with fear, unhappiness, anxiety and other emotional disturbance when such activity is imposed upon them. Families with infants and young children who must pass through the ring of focused picketing in order to attend or leave religious activities are for [sic] the time of entrance to the time of departure, captive audiences. Their option of foregoing their worship or other religious activity on the one hand, or risking pain and injury to their children on the other, amounts to a substantial and intolerable burden on their personal religious freedom. The technique of using focused picketing to disturb the very young so their families will feel coercion either to comply with picketers’ wishes or forego their chosen religious activity entirely, is a pernicious and contemptible form of harassment.
Id. at 174.
The plaintiffs are four individuals who oppose abortion and have peacefully picketed outside Westminster. There are no allegations that these four plaintiffs have ever carried graphic signs or have directed their protests toward children. The plaintiffs admit, however, that other protestors *1184 have carried signs containing “graphic photos of abortion.” J.A. at 139. Two days after the ordinance was passed, the plaintiffs filed a complaint in federal district court seeking to have the ordinance declared unconstitutional. The district court issued a preliminary injunction against the enforcement of the ordinance, and this appeal followed.
II. DISCUSSION
The Supreme Court has declared that “[a] State or municipality may protect individual privacy by enacting reasonable time, place, and manner regulations applicable to all speech irrespective of content.” Erznoznik v. City of Jacksonville, 422 U.S. 205, 209, 95 S.Ct. 2268, 45 L.Ed.2d 125 (1975). Nothing in the Constitution leaves localities powerless to legislate “to protect the public from the kind of boisterous and threatening conduct that disturbs the tranquility of spots selected by the people either for homes, ... or for public and other buildings that require peace and quiet to carry out their functions, such as courts, libraries, schools, and hospitals.” Gregory v. Chicago, 394 U.S. 111, 118, 89 S.Ct. 946, 22 L.Ed.2d 134 (1969) (Black, J., concurring). Local governments may enforce time, place, and manner restrictions on expressions that are content neutral, are narrowly tailored to serve a significant government interest, and leave open ample alternative channels of communication. See United States Postal Serv. v. Council of Greenburgh Civic Ass’ns, 453 U.S. 114, 132, 101 S.Ct. 2676, 69 L.Ed.2d 517 (1981).[2]

A. Significant Government Interest

It must be determined whether the government has a significant interest in protecting individuals who attend religious rites and observances from unwanted messages during those rites and observances. While this precise issue is one of first impression in this circuit, Frisby v. Schultz, 487 U.S. 474, 108 S.Ct. 2495, 101 L.Ed.2d 420 (1988) provides the precedent for which to decide this important question.
In Frisby, the Supreme Court upheld a content-neutral ordinance that prohibited picketing in front of an individual’s home. The purpose of that ordinance was to protect and preserve the sanctity of the home by ensuring that people could “enjoy in their homes and dwellings a feeling of well-being, tranquility, and privacy.” Id. at 477, 108 S.Ct. 2495. The Town Board of Brookfield, Wisconsin, which had enacted the ordinance in Frisby, believed that the ban was needed because “the practice of picketing before or about residences and dwellings causes emotional disturbance and distress to the occupants .... ” Id.
In upholding the ban, the Court found that the ordinance served a significant government interest. It recognized that protecting the well-being, tranquility, and privacy of the home was a goal of the “highest order” and that “ ‘preserving the sanctity of the home, [the place in which] men and women can repair to escape from the tribulations of their daily pursuits, is surely an important value.’ ” Id. at 484, 108 S.Ct. 2495 (quoting Carey v. Brown, 447 U.S. 455, 471, 100 S.Ct. 2286, 65 L.Ed.2d 263 (1980)). In deciding the case now before us, the issue is whether similar interests are present here, and, if so, whether those interests warrant similar methods of protection.
In Frisby, the Court recognized that preserving the well-being, tranquility and privacy of the home was a significant interest. See Frisby, 487 U.S. at 484, 108 S.Ct. 2495. An important aspect of residential privacy, according to Fñsby, was protecting the unwilling listener. See id. The Court noted that “in many locations, we *1185 expect individuals simply to avoid speech they do not want to hear .Id. Nevertheless, the fact “[t]hat we are often ‘captives’ outside the sanctuary of the home and subject to objectionable speech ... does not mean we must be captives everywhere.” Id. (quoting Rowan v. Post Office Dep’t, 397 U.S. 728, 738, 90 S.Ct. 1484, 25 L.Ed.2d 736 (1970)) (omission in original). As a result, the Court found no right on the part of picketers to “force speech into the home of an unwilling listener.” Id. at 485, 108 S.Ct. 2495.
The government’s interest in preserving the right of churchgoers to attend religious services free from substantial interference is strikingly similar to the interest in preserving the privacy of the home noted by the Frisby Court. One of our sister circuits recently held, also in the context of a content-neutral ordinance, that the government has a legitimate interest in protecting churchgoers from harassment and ensuring their access to church premises. See Edwards v. City of Santa Barbara, 150 F.3d 1213 (9th Cir.1998), cert. denied, — U.S. —, 119 S.Ct. 1142, 143 L.Ed.2d 209 (1999).[3] For the reasons that follow, I agree.
First, like the privacy of the home, the right of freedom to worship is one long-recognized by our society. The First Amendment protects this fundamental right from government interference. The Declaration of Independence recognizes it as an unalienable right that permits individuals to pursue happiness. This nation’s history alone shows us that the fundamental right to worship is as important as the right to privacy within the home.
Second, the government has a significant interest in protecting the well-being and tranquility in a house of worship. Like the home, houses of worship — whether church, synagogue, or mosque — are sacred places where people seek rest and replenishment. Justice Black described the home as “the last citadel of the tired, the weary, and the sick .... ” Gregory v. Chicago, 394 U.S. 111, 125, 89 S.Ct. 946, 22 L.Ed.2d 134 (1969) (Black, J., concurring). This description applies with equal force to houses of worship.
For Westminster’s parishioners to attend their house of worship, they must listen to the unwanted and coercive messages forced upon them by the picketers. For those churchgoers, attending worship service is anything but tranquil. If members choose to attend religious services or activities, they must withstand the harassment and intimidation tactics of the protestors. Westminster members can either choose to attend church and endure the demonstrations, or they can stay home and forfeit their right to worship.
Third, the aspect of residential privacy that the Frisby Court found so important — the “unwilling listener”' — -is present here.[4] The members of Westminster are *1186 captives of unwanted speech as they attend their church, their religious home. “The First Amendment permits the government to prohibit offensive speech as intrusive when the ‘captive’ audience cannot avoid the objectionable speech.” Frisby, 487 U.S. at 487, 108 S.Ct. 2495. Here, the City of Lincoln has every interest in ensuring that individuals may exercise their religious beliefs free from intrusive and unduly coercive messages.[5] As such, just as the local government has a significant interest in protecting privacy within the home in Frisby, so too does the government of the City of Lincoln in protecting the fundamental rights of individuals to practice their religion undisturbed in the church of their choice.

B. Nairowly Tailored

Even if an ordinance serves a substantial government interest, it must be narrowly tailored to achieve that interest. See Perry Educ. Ass’n v. Perry Local Educators’ Ass’n, 460 U.S. 37, 45, 103 S.Ct. 948, 74 L.Ed.2d 794 (1983). In Frisby, the Court held that the ordinance in question there was narrowly tailored because it prevented only focused picketing in front of a particular residence. Because the ordinance targeted and eliminated “no more than the exact source of the ‘evil’ it [sought] to remedyt,]” it was sufficiently narrow. Frisby, 487 U.S. at 485, 108 S.Ct. 2495 (quoting City Council of Los Angeles v. Taxpayers for Vincent, 466 U.S. 789, 808-10, 104 S.Ct. 2118, 80 L.Ed.2d 772 (1984)). The Court found that the picketers “generally [did] not seek to disseminate a message to the general public, but ... intrude[d] upon the targeted resident, and ... [did] so in an especially offensive way.” Id. at 486, 108 S.Ct. 2495. In directing their message to a particular resident, the picketing had a “devastating effect ... on the quiet enjoyment of the home ....” Id.
The same is true here. Lincoln’s ordinance restricts focused picketing in a very limited way. From one-half hour before to one-half hour after religious services or activities, the protestors must not picket on the adjoining sidewalk and entryways to the church. The picketers are free to leaflet and to give anyone a leaflet if that person will accept it. The picketers may demonstrate as much as they wish across the street so long as they do not interfere with the religious service.
Given these limitations, this ordinance is far more narrow in its application than was the ordinance in Frisby. There, all picketing was banned at all times in front of a residence. Here, the ordinance applies only to those limited times immediately before and after a religious service or activity. In addition, only large demonstrative materials such as placards, banners or signs are prohibited. The ordinance targets only those places and forms of communication that are likely to have a coercive effect on the churchgoer — the placards that are held up to the faces of all the churchgoers, rested upon family vehicles, and targeted at the parishioners, at a very close range, as they enter and exit the church. All other communication and speech by the protestors is permitted. In light of Frisby, this ordinance is narrowly tailored.
The majority concludes that the ordinance is overbroad because it restricts all picketing, regardless of what the signs communicate or depict, and as such the *1187 regulation is not narrowly tailored to protect young children. The ordinance is also overbroad, according to the majority, because it regulates communication with adults. The majority states that the City of Lincoln is not justified to pass an ordinance simply because “adults attending Westminster Presbyterian Church probably do not like the signs and disagree with them.” In so stating, the majority characterizes the adult churchgoers’ opposition to the picketers as based on a simple disagreement with the message conveyed or a mere dislike for the signs.
But the record clearly shows that the adults are affected in a much more acute way than by mere disapproval of the signs. To attend the church of their choice, those adults must listen to jeering shouts and view graphic images, as large as six feet, of decapitations and mutilations. See J.A. at 40 n. 7. The parishioners’ concerns about the effects of the picketing are more than just disagreement with the message. They must listen to messages that are intended to cause all churchgoers, adults and children alike, psychological distress. As Justice Stevens stated in Frisby, “picketing for the sole purpose of imposing psychological harm on a family” is not constitutionally protected. Frisby, 487 U.S. at 498, 108 S.Ct. 2495 (Stevens, J„ dissenting). Lincoln’s ordinance prohibits only that limited range of speech that is likely to impose a harmful psychological impact. In this respect, the ordinance reaches no more speech than is necessary to prevent the evil. Lincoln’s ordinance is narrowly tailored.

C. Alternative Channels of Communication

The next issue is whether the Lincoln ordinance leaves open ample alternative channels of communication. As noted above, the ordinance prohibits the use of banners, placards, signs or other demonstrative materials. In this respect, it is similar to the ban in Frisby because it prohibits only a discrete type of expression. In Frisby, “focused picketing taking place solely in front of a particular residence” was prohibited. Id. at 483, 108 S.Ct. 2495. The Frisby Court found that protestors were not “barred from the residential neighborhoods. They may enter such neighborhoods, alone or in groups, even marching .... They may go door-to-door to proselytize their views. They may distribute literature in this manner ... or through the mails.” Id. at 484, 108 S.Ct. 2495 (omissions in original). The same is true here. The picketers may protest as much as they wish across the street, or anywhere else for that matter, except in the limited areas set forth in the ordinance. In addition, they may also picket directly on the sidewalks abutting houses of worship, provided they do so at times other than those proscribed. The plaintiffs have more than ample alternatives to express their views.

D. Action v. Gannon

Finally, I disagree that Action v. Gannon, 450 F.2d 1227 (8th Cir.1971), compels a holding that the Lincoln ordinance is unconstitutional. In that case, members of the Black Liberation Front entered a cathedral on numerous occasions. They engaged in various demonstrations within the church including marching down the aisles, using amplifiers to communicate their “demands,” approaching the lectern to speak to the congregation, and blocking communion rails. Id. at 1229. The district court issued a permanent injunction that prevented them from interrupting or disrupting services.
This court held that the defendants had no right to enter the cathedral and disrupt services because such disruption was an “intolerable violation of the rights of those engaged in worship.” Id. at 1233. The court held that the plaintiffs were “clearly entitled to injunctive relief because the evidence established that the defendants had disrupted religious services at the cathedral and that they would continue to do so unless enjoined” id. at 1238, but held *1188 that the injunction must be revised so as to not deprive the defendants of their First Amendment rights. See id.
Action dealt with a different question than the one before us. At issue there was whether the defendants could be enjoined from entering a cathedral and disrupting services. This court held the district court could enjoin them. The court, however, revised the injunction to preserve the defendants’ right to protest. In this case we consider whether it is within the government’s power to enforce time, place and manner restrictions on demonstrations near religious premises to protect the churchgoers’ First Anendment rights of freedom of assembly and worship.
In any event, Action supports the holding I reach. Action stands for the proposition that individuals shall not interfere with the free exercise of religion. It serves as a basis in this case to allow the government to prevent the interference of those entering and leaving the church. In this respect, Action supports a holding that the ordinance is constitutional.
I add this final comment. The ordinance in question applies to all who violate its terms. Obviously, it would be impossible to write a content-neutral ordinance that drew a line between signs with graphic, bloody images as carried by some protestors and informational messages as carried by others. The plaintiffs here as peaceful picketers, which they claim they are, really face little restriction on then-activities. At all times they may walk on the sidewalk and entryways to church property, distribute leaflets expressing their views, and ask to speak to those in the vicinity who are willing to listen to them. They also may carry signs and banners except at very limited times, that is, from one-half hour before to one-half hour after a scheduled activity or service.
This minor limitation on the plaintiffs’ activities pales in comparison to the incivility, invasion of tranquility, and intimidation tactics visited upon those seeking to enter the church of their choice. That interference should not be countenanced.
The Lincoln ordinance bans speech directed principally at those unwilling listeners attending church services or activities. The government’s interest here is substantial, the nature and scope of the ordinance make the prohibition narrowly tailored, and the protestors retain ample alternative channels of communication. The City Council of Lincoln has enacted a wise and fair ordinance. In declaring the ordinance unconstitutional, the majority of this court disregards the rights of churchgoing parents and children who suffer intimidating tactics from some protestors. They should not be required to face such a gauntlet. Therefore, I strongly dissent.

. The majority, like the District Court, did not rule on the content neutrality of the ordinance, but instead assumed that it was content neutral. That issue is not disputed here. I add that it is also undisputed that the ordinance regulates speech in a traditionally public forum. See, e.g., Carey v. Brown, 447 U.S. 455, 460, 100 S.Ct. 2286, 65 L.Ed.2d 263 (1980) (sidewalks historically associated with First Amendment rights).

. In Edwards, the Ninth Circuit considered the validity of a content-neutral ordinance that prohibited all demonstration activity within a certain distance of health care facilities and places of worship. See Edwards, 150 F.3d at 1215. The Edwards panel held that the government’s interest in protecting persons engaging in worship from intimidation and harassment and its interest in ensuring access to places of worship was a sufficient government interest to sustain the ordinance. See id. at 1216. The court also held that the ordinance was narrowly tailored to ensure access to religious premises and left open alternative means of communication. See id. at 1217. See also Tompkins v. Cyr, 995 F.Supp. 664, 681 n. 10 (N.D.Tex.1998) ("The Court is troubled by the notion that a person may be subjected to focused picketing at their place of worship. Indeed, the right to engage in quiet and reflective prayer without being subjected to unwarranted intrusion is an essential component of freedom of religion. The government certainly has a significant interest in protecting this important First Amendment right.”).

. The notion that individuals should not be captives to unwanted speech is not a novel one, and government regulations that prohibit intrusive speech have been repeatedly upheld. See FCC v. Pacifica Found., 438 U.S. 726, 748-749, 98 S.Ct. 3026, 57 L.Ed.2d 1073 (1978) (offensive radio broadcasts); Rowan, supra (offensive mailings); Kovacs v. Cooper, *1186 336 U.S. 77, 86-87, 69 S.Ct. 448, 93 L.Ed. 513 (1949) (sound trucks).

. Even Justice Brennan, who dissented in Frisby, recognized that "[w]ithout question there are many aspects of residential picketing that, if unregulated, might easily become intrusive or unduly coercive.” Frisby, 487 U.S. at 494, 108 S.Ct. 2495 (Brennan, J„ dissenting). Justice Brennan noted that the protestors in Frisby trespassed and warned young children not to go near the house of the abortion doctor because the doctor was a "baby killer.” Id. “Surely it is within the government’s power to enact regulations as necessary to prevent such intrusive and coercive abuses.” Id.