Marilyn OLMER, an Individual, John Kelly, an Individual, Theresa Lane, an Individual, and Michelle Mann, an Individual, Plaintiffs,

v.

CITY OF LINCOLN, a Municipality, William Austin, in his Official Capacity as Lincoln City Attorney, and Thomas Casady, in his Capacity as Chief of the Lincoln Police Department, Defendants.

No. 4:98CV3311.

United States District Court, D. Nebraska.

Nov. 4, 1998.

Jefferson Downing, Gary L. Young, Keating, O'Gara Law Firm, Lincoln, NE, Vollis E. Summerlin, Jr., Krista L. Kester, Osborn, Summerlin Law Firm, Lincoln, NE, for Plaintiffs.

Daniel E. Klaus, Rembolt, Ludtke Law Firm, Lincoln, NE, Mark S. Shelton, David Donovan, Wilmer, Cutler Law Firm, Washington, DC, for Defendants.

**1094**

## MEMORANDUM AND ORDER

KOPF, District Judge.

Plaintiffs—four individuals who have engaged in protests and demonstrations opposing abortion in the vicinity of a Presbyterian church in Lincoln, Nebraska—seek a preliminary injunction prohibiting enforcement of a Lincoln city ordinance that makes it unlawful for any person to intentionally or knowingly engage in "focused picketing" of a "scheduled religious activity" at certain times and within certain boundaries of a religious premises.

The plaintiffs claim that the ordinance violates the Free Speech, Establishment, and Free Exercise Clauses of the First Amendment,[1] as well as the Equal Protection and Due Process Clauses of the Fourteenth Amendment.[2] Further, the plaintiffs claim that the ordinance is unconstitutionally vague, ambiguous, and overbroad. (Filing 1, Compl. for Declaratory & Inj. Relief ¶ 31.) The defendants—the City of Lincoln and its city attorney and chief of police[3]—assert, among other things, that the ordinance is a constitutional time, place, and manner restriction upon expressive activity that does not violate the First Amendment.

After an evidentiary hearing on the plaintiffs' preliminary injunction motion, I conclude that a preliminary injunction should issue because the ordinance is not narrowly tailored to serve the government interest that prompted the ordinance, in violation of the Free Speech Clause of the First Amendment.[4] Given the court's resolution of the plaintiffs' Free Speech Clause argument, and

because federal courts are required to avoid unnecessary and broad adjudication of constitutional issues, I do not reach the merits of the plaintiffs' other constitutional claims.[5] See Ashwander v. Tennessee Valley Auth., 297 U.S. 288, 347, 56 S.Ct. 466, 80 L.Ed. 688 (1936) (Brandeis, J., concurring) ("The Court will not pass upon a constitutional question although properly presented by the record, if there is also present some other ground upon which the case may be disposed of."); American Foreign Serv. Ass'n v. Garfinkel, 490 U.S. 153, 161, 109 S.Ct. 1693, 104 L.Ed.2d 139 (1989) (district court should not pass on constitutional question unless it was "imperative" on remand in case involving statute which precluded use of appropriated funds to implement or enforce nondisclosure agreements signed by Executive Branch employees; "courts should be extremely careful not to issue unnecessary constitutional rulings"); Carhart v. Stenberg, 972 F.Supp. 507, 509 (D.Neb.1997) (court declined to reach merits of alternative constitutional argument regarding state's "partial-birth" abortion law because federal courts are to avoid unnecessary and broad adjudication of constitutional issues, and court resolved request for preliminary injunctive relief on another constitutional ground).

## I. FINDINGS OF FACT

### The Ordinance

1. On September 14, 1998, the Lincoln City Council passed Ordinance No. 17413, which created Lincoln Municipal Code

---

1. "Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof; or abridging the freedom of speech...." U.S. Const. amend. I. Pursuant to the Fourteenth Amendment, city ordinances fall within the scope of the First Amendment's limitation on governmental authority. *Members of City Council v. Taxpayers for Vincent*, 466 U.S. 789, 792 n. 2, 104 S.Ct. 2118, 80 L.Ed.2d 772 (1984) (citing *Lovell v. City of Griffin*, 303 U.S. 444, 58 S.Ct. 666, 82 L.Ed. 949 (1938)).

2. "No State shall ... deprive any person of life, liberty, or property, without due process of law; nor deny to any person within its jurisdiction the equal protection of the laws." U.S. Const. amend. XIV.

3. As noted later, the city attorney advised the city council that the ordinance at issue was unconstitutional. The chief of police also informed the

city council that he had not been able to substantiate the claims of church members that the protestors engaged in picketing that was overtly threatening or physically abusive.

4. I take this opportunity once again to praise counsel for each side. Their briefs have been well written, their arguments cogent and candid, and their commitment to professionalism and civility outstanding.

5. During the hearing on Plaintiffs' motion for a preliminary injunction, both parties agreed that the court should not now decide Plaintiffs' remaining claims. In particular, the defendants indicated they had not submitted evidence to the court sufficient to establish a factual basis for the court to rule on those claims.

§ 9.20.090. Lincoln Mayor Mike Johanns vetoed the ordinance on September 16, 1998, but the Lincoln City Council voted to override the mayor's veto on September 21, 1998. Section 9.20.090 provides as follows:

**9.20.090 Disturbing the Peace by Focused Picketing at Religious Premises**

(a) Definitions. As used in this ordinance, the following terms shall have the meanings here set forth:

(1) The term "religious premises" shall mean "the property on which is situated any synagogue, mosque, temple, shrine, church or other structure regularly used for the exercise of religious beliefs, whether or not those religious beliefs include recognition of a God or other supreme being";

(2) The term "scheduled religious activity" shall mean "an assembly of five or more persons for religious worship, wedding, funeral, memorial service, other sacramental ceremony, religious schooling or religious pageant at a religious organization's premises, when the time, duration and place of the assembly is made known to the public, either by a notice published at least once within 30 days but not less than 3 days before the day of the scheduled activity in a legal newspaper of general circulation in the city or in the alternative by posting the information in a reasonably conspicuous manner on the exterior premises for at least 3 days prior to and on the day of the scheduled activity."

(3) The term "focused picketing" shall mean "the act of one or more persons stationing herself, himself or themselves outside religious premises on the exterior grounds, or on the sidewalks, streets or other part of the right of way in the immediate vicinity of religious premises, or moving in a repeated manner past or around religious premises, while displaying a banner, placard, sign or other demonstrative material as a part of their expressive conduct." The term "focused picketing" shall not include distribution of leaflets or literature.

(b) It shall be deemed an unlawful disturbance of the peace for any person intentionally or knowingly to engage in focused picketing of a scheduled religious activity at any time within the period from one-half hour before to one-half hour after the scheduled activity, at any place (1) on the religious organization's exterior premises, including its parking lots; or (2) on the portion of the right of way including any sidewalk on the same side of the street and adjoining the boundary of the religious premises, including its parking lots; or (3) on the portion of the right of way adjoining the boundary of the religious premises which is a street or roadway including any median within such street or roadway; or (4) on any public property within 50 feet of a property boundary line of the religious premises, if an entrance to the religious organization's building or an entrance to its parking lot is located on the side of the property bounded by that property line. Notwithstanding the foregoing description of areas where focused picketing is restricted, it is hereby provided that no restriction in this ordinance shall be deemed to apply to focused picketing on the right of way beyond the curb line completely across the street from any such religious premises.

2. Ordinance No. 17413, which created Lincoln Municipal Code § 9.20.090, contains a severability clause that states: "If any part of this ordinance shall be adjudged to be invalid or unconstitutional, such adjudication shall not affect the validity of this ordinance as a whole, or any part thereof not adjudged invalid or unconstitutional." City of Lincoln Ordinance No. 17413 § 3 (Sept. 21, 1998).

3. Ordinance No. 17413 contains a section entitled "Legislative Intent and Findings," which characterizes the focused-picketing law as a "time, place and manner restriction[ ] ... intended to provide narrowly tailored, reasonable, common[-]sense limitations on focused picketing." City of Lincoln Ordinance No. 17413 § 1(f) (Sept. 21, 1998). The statement of legislative intent further provides:

It is the intent of this ordinance to preserve the peace at religious premises in order to protect and secure several significant and compelling interests of this city. Those interests include the health, safety and welfare of all the citizens and especially of children, all citizens' freedoms of ex-

pression, assembly, association and religion, and the ordinary, good public order of the community.

City of Lincoln Ordinance No. 17413 § 1(a) (Sept. 21, 1998). The statement of intent contains a finding that the focused picketing to be regulated disrupts religious activities, hinders reasonable access to religious activities by families with young children, disturbs the peace of those seeking to participate in such activities, and interferes with the use and safety of public sidewalks and streets that provide access to religious premises. City of Lincoln Ordinance No. 17413 § 1(b) (Sept. 21, 1998). According to the statement of legislative intent, "This ordinance is intended only to prohibit a certain specified form of disturbance of the peace which arises when one form of expressive conduct, focused picketing, tends to override another form of expressive conduct, namely free exercise of religion." City of Lincoln Ordinance No. 17413 § 1(c) (Sept. 21, 1998). The statement goes on to describe the specific injury targeted by the legislation:

> The mechanism of such injury to individual freedom of religion operates as follows: infants and young children are emotionally vulnerable to focused picketing in close proximity to them, which is a typical characteristic of focused picketing at religious premises, and many of these children tend to react with fear, unhappiness, anxiety and other emotional disturbance when such activity is imposed on them. Families with infants and young children who must pass through the ring of focused picketing in order to attend or leave religious activities are for the time of entrance to the time of departure, captive audiences. Their option of foregoing their worship or other religious activity on the one hand, or risking pain and injury to their children on the other, amounts to a substantial and intolerable burden on their personal religious freedom. The technique of using focused picketing to disturb the very young so their families will feel coercion either to comply with picketers' wishes or forego their chosen religious activity entirely, is a pernicious and contemptible

form of harassment. A buffer zone to protect against focused picketing at the immediate borders of religious premises is a reasonable remedy, and by reducing the proximity will provide some protection to the peace of mind of children and to the religious freedom of families.

City of Lincoln Ordinance No. 17413 § 1(e) (Sept. 21, 1998).

4. On September 30, 1998—within days of the ordinance's effective date—this court issued a temporary restraining order (filing 9) prohibiting enforcement of Lincoln Municipal Code 9.20.090, also known as Ordinance No. 17413. The temporary restraining order was to be effective for no longer than 10 days pursuant to Fed.R.Civ.P. 65(b), but counsel for the parties subsequently agreed to extend the temporary restraining order until November 2, 1998, or until issuance of this court's order granting or denying the plaintiffs' motion for preliminary injunction.

### The Plaintiffs' Picketing Activity

5. Plaintiffs John Kelly, Theresa Lane, and Michelle Mann hold religious, political, and moral beliefs that abortion is wrong and that the appointment of Dr. Winston Crabb, a medical doctor, as a deacon and elder in the Westminster Presbyterian Church in Lincoln, Nebraska, violated Biblical requirements. (Affs. John Kelly, Theresa Lane & Michelle Mann ¶¶ 2–4.) These plaintiffs have engaged in protests and demonstrations on the public sidewalk that adjoins Westminster Presbyterian Church, carrying signs which read, "Winston Crabb, Abortionist and Elder," "1 Corinthians 5:13," "Dr. Crabb is Unfit to be an Elder," "Jesus Loves the Little Children," and "Life." These plaintiffs testified [6] that they have never intentionally or knowingly harassed, threatened, or intimidated anyone, including children, during their protests at Westminster Presbyterian Church. (Id. ¶¶ 5–7.) Specifically, they testified that:

> While carrying protest signs at the church, I generally hold the sign in a manner that allows those walking along the sidewalk or driving by on the street to read the sign,

---

**6.** The word "testified" will be used throughout this memorandum and order to apply to testimony given by deposition, affidavit, or live.

but I have not used the sign to: (a) block or attempt to block anyone's access to the church, church parking lot, or public sidewalk; (b) touch, strike or attempt to touch or strike anyone; and (c) never attempted to force any apparently unwilling viewers to read my sign by either following viewers who have turned away from my sign, by intentionally moving my sign into the line of sight of viewers who have turned away from my sign, or by particularly targeting my sign at any apparently unwilling viewers.

(*Id.* ¶ 8.)

6. Larry Donlan is the director of Rescue the Heartland, the organization allegedly responsible for the picketing activities at Westminster Presbyterian Church. Donlan testified before the Lincoln City Council that the picketers at Westminster "agreed to exclude graphic photos of abortion from the south side entrance of the church. So, those who objected to them could enter on that side." *Minutes of the Regular Lincoln City Council Meeting: Comments During Public Hearing on Amending Chapter 9.20 of the LMC by Adding a New Section Numbered 9.20.090,* at 28 (Sept. 8, 1998) (comments of Larry Donlan, Director of Rescue the Heartland).

7. Lincoln Chief of Police Tom Casady testified that during police monitoring of the picketing at Westminster Presbyterian Church over the course of several months, the "officers have not seen anyone being chased. They haven't seen any physical confrontations nor anyone's way being blocked or impeded. They haven't seen anyone committing a crime. There's been dialog, but nothing that officers felt rose to the level of something for instance like terroristic threats or disturbing the peace." The police monitoring at Westminster included police officers in plain clothes patrolling the area and videotaping from a vehicle. *Minutes of the Regular Lincoln City Council Meeting: Comments During Public Hearing on Amending Chapter 9.20 of the LMC by Adding a New Section Numbered 9.20.090,* at 36 (Sept. 8, 1998) (comments of Chief of Police Tom Casady).

8. Members of the congregation and clergy of Westminster Presbyterian Church testified that the picketers have thrust five- to six-foot signs at children as they enter and exit the church, and "children, after being confronted with such signs, have experienced nightmares and problems with sleeping"; picketers have displayed "gruesome and graphic" signs against side and rear windows of cars in which children were seated when such cars were entering or exiting the Westminster vicinity; "part of Sunday routine included asking our children to remove their seat belts and sit on the floor as we pulled out of the church parking lot to avoid having them see the large graphic signs"; "When my children and I attend worship services together, my children are always confronted by the picketers with their graphic signs. When I attend services alone, I am rarely targeted by the picketers"; "it breaks my heart that my now aged 6 year old son is telling his younger sister, 'Put your head down, don't look, those bad people are there'"; the picketers target religious services and activities children are likely to attend; and 15 families—most with young children—have left the Westminster Presbyterian Church because of the picketing at the church. (Aff. Rev. William C. Yeager ¶ 5; Aff. Jane Sievers ¶ 3; Aff. Joseph J. Morten ¶¶ 3, 4, 6; Aff. Maureen Allman ¶ 3; Aff. Mary E. Huenink ¶¶ 3–4; Aff. Carl Horton ¶¶ 3–6 & 9.)

### The City Council's Vote

9. Before passing the challenged ordinance, the Lincoln City Council heard a substantial amount of anecdotal testimony describing the picketing activities at Westminster Presbyterian Church, as well as comments from law professors, Westminster's attorney, and City Attorney Bill Austin. Mr. Austin advised the City Council that, in his view, the proposed Lincoln ordinance was unconstitutional. *Minutes of the Regular Lincoln City Council Meeting: Comments During Public Hearing on Amending Chapter 9.20 of the LMC by Adding a New Section Numbered 9.20.090,* at 4 (Sept. 8, 1998) (comments of City Attorney Bill Austin).

## II. CONCLUSIONS OF LAW

### A. Preliminary Injunction Standards

In *Dataphase Systems, Inc. v. CL Systems, Inc.,* 640 F.2d 109 (8th Cir.1981), the

court, sitting *en banc,* clarified the standard district courts should apply when considering a motion for preliminary injunctive relief:

(1) the threat of irreparable harm to the movant; (2) the state of balance between this harm and the injury that granting the injunction will inflict on other parties litigant; (3) the probability that movant will succeed on the merits; and (4) the public interest.

*Dataphase,* 640 F.2d at 114. "No single factor in itself is dispositive; rather, each factor must be considered to determine whether the balance of equities weighs toward granting the injunction." *United Indus. Corp. v. Clorox Co.,* 140 F.3d 1175, 1179 (8th Cir.1998).

At base, the question is whether the balance of equities so favors the movant that justice requires the court to intervene to preserve the status quo until the merits are determined....

. . ...

[W]here the balance of other factors tips decidedly toward movant a preliminary injunction may issue if movant has raised questions so serious and difficult as to call for more deliberate investigation.

*Dataphase,* 640 F.2d at 113.

### 1. Probability of Success on the Merits

The First Amendment provides in part that "Congress shall make no law ... abridging the freedom of speech...." U.S. Const. amend. I. "There is no doubt that as a general matter peaceful picketing ... [is] expressive activit[y] involving 'speech' protected by the First Amendment." *United States v. Grace,* 461 U.S. 171, 103 S.Ct. 1702, 75 L.Ed.2d 736 (1983) (statute prohibiting display of flags, banners, or devices designed to bring into public notice any party, organization, or movement on United States Supreme Court grounds held unconstitutional as applied to public sidewalks on the Court's grounds because statute did not substantially serve its purpose).

■■■ "It is also true that 'public places' historically associated with the free exercise of expressive activities, such as streets, sidewalks, and parks, are considered, without more, to be 'public forums.' " *Id.* " '[T]ime out of mind' public streets and sidewalks have been used for public assembly and debate,

the hallmarks of a traditional public forum." *Frisby v. Schultz,* 487 U.S. 474, 480, 108 S.Ct. 2495, 101 L.Ed.2d 420 (1988) (quoting *Perry Educ. Ass'n v. Perry Local Educators' Ass'n,* 460 U.S. 37, 45, 103 S.Ct. 948, 74 L.Ed.2d 794 (1983)). The government's ability to restrict expressive activities in these public places is very limited.

In these quintessential public forums, the government may not prohibit all communicative activity. For the State to enforce a content-based exclusion it must show that its regulation is necessary to serve a compelling state interest and that it is narrowly drawn to achieve that end. The State may also enforce regulations of the time, place, and manner of expression which are content-neutral, are narrowly tailored to serve a significant government interest, and leave open ample alternative channels of communication.

*Perry,* 460 U.S. at 45, 103 S.Ct. 948 (citations omitted).

#### a. Content Neutrality

■■■ A governmental regulation of expressive activity will be deemed content-neutral if it is "justified without reference to the content of the regulated speech." *Ward v. Rock Against Racism,* 491 U.S. 781, 791, 109 S.Ct. 2746, 105 L.Ed.2d 661 (1989) (emphasis and internal quotation omitted).

The principal inquiry in determining content neutrality, in speech cases generally and in time, place, or manner cases in particular, is whether the government has adopted a regulation of speech because of disagreement with the message it conveys. The government's purpose is the controlling consideration. A regulation that serves purposes unrelated to the content of expression is deemed neutral, even if it has an incidental effect on some speakers or messages but not others.

*Id.*

■■■ At this early stage of the litigation, I assume the ordinance at issue is content-neutral because (1) the ordinance facially bans all "focused picketing" regardless of the apparent message sought to be conveyed; and (2) the Lincoln City Council's purpose in passing the ordinance and overriding the

mayor's veto was, superficially at least, unrelated to the content of the expression conveyed by those engaging in focused picketing. However, I note that the evidence at trial could very well be otherwise.

There is evidence in the record that the ordinance at issue was written by the attorney for the Westminster Presbyterian Church; that the attorney, on the church's behalf, was attempting to target and regulate demonstrators who carry anti-abortion signs [7] outside of that particular church; and that the ordinance was drafted broadly for strategic purposes in order to avoid perceived constitutional difficulties.[8] Moreover, as noted earlier, the city attorney advised the city council that the ordinance was unconstitutional. Still further, the chief of police advised the city council that "officers have not seen anyone being chased. They haven't seen any physical confrontations nor anyone's way being blocked or impeded. They haven't seen anyone committing a crime. There's been dialog, but nothing that officers felt rose to the level of something for instance like terroristic threats or disturbing the peace." From this and other evidence, a plausible argument can be made that the ordinance's facial content-neutrality is but a pretext for siding with a large and influential church to the detriment of a few protestors who seek to express a contrary religious point of view.

### b. Significant Interest

■ I find and conclude that the interest sought to be served by the ordinance is protecting very young children from being forced to view extremely graphic and quite disturbing images upon their entrance to, or exit from, church. Such images frighten the very young, and cause their parents to shy away from attending church with their children.

During argument on Plaintiffs' motion for a temporary restraining order, counsel for Defendants conceded that the interest sought to be protected by the ordinance was not adults, but "to protect children or their parents who are reluctant to go to church because of the impact on the child." (TRO Hr'g Tr. 38:17–40:21.) The "legislative intent and findings" section of Ordinance 17413 reflects this interest, stating that the ordinance seeks to protect several interests, "especially of children"; that picketing in a manner that disrupts religious activities or hinders access to such activities "by families with young children" disturbs the peace of individuals wishing to participate in religious activities and impedes public access to religious premises; and that "injury to individual freedom of religion" occurs when "infants and young children," who are "emotionally vulnerable to focused picketing in close proximity to them," are faced with such picketing, causing "fear, unhappiness, anxiety and other emotional disturbance when such activity is imposed on them." City of Lincoln Ordinance No. 17413 §§ 1(a), (b), (e) (Sept. 21, 1998).

Testimony before the Lincoln City Council regarding the ordinance included numerous references to "gruesome," "horrific," "scary," "gross," and "graphic" signs being displayed to children by the picketers at Westminster.

---

7. For example, at the public hearing on Ordinance 17413, there was repeated testimony about the desirability of the ordinance because the protestors carried "an enlarged sign of a bloody, dead, mutilated baby," "six[ ]foot signs of decapitated and dismembered babies," "a bloody baby picture," and "horrifying enlarged signs and photographs of dismembered bloody fetuses." *Minutes of the Regular Lincoln City Council Meeting: Comments During Public Hearing on Amending Chapter 9.20 of the LMC by Adding a New Section Numbered 9.20.090*, at 11, 14, 15, 18, 19 (Sept. 8, 1998).

8. At the voting session of the Lincoln City Council on September 14, 1998, regarding Lincoln Municipal Code 9.20.090, Westminster attorney Alan Peterson stated:

And, while we could have tried to pair [sic] this down even narrower in a sense by saying that only certain signs which scare kids will be forbidden on that side of the street, the problem, ... is, if ... government starts selecting which signs are okay [and] which signs are not, that's content control. That's the worst thing [and] really faces [an] even tougher constitutional test. So, that's why we say all signs, banners, [and] placards. I think strategically, legally it's more defensible this way [and] especially since we're not saying don't use the signs. We're simply saying go across the street.

*Minutes of the Regular Lincoln City Council Meeting: Verbatim Comments During Voting Session on Amending Chapter 9.20 of the LMC by Adding a New Section Numbered 9.20.090*, at 3 (Sept. 14, 1998).

*Minutes of the Regular Lincoln City Council Meeting: Comments During Public Hearing on Amending Chapter 9.20 of the LMC by Adding a New Section Numbered 9.20.090* (Sept. 8, 1998). Comments by Westminster's attorney and various Lincoln City Council members at the voting session on the proposed ordinance indicate that protection of children from this graphic signage was the interest to be furthered by the ordinance.

For example, in response to a Council member's question regarding whether "this ordinance is going to take care of the problem," Westminster attorney Alan Peterson stated, "[I]t was the close proximity of the big signs or whatever form of material being involved was frightening, disturbing children.... [T]he experience of harm that has been shown has actually been the harm of frightening ... the children." City Council member Johnson stated, "The children are still the issue [and] the one's [sic] we are going to make a decision for," and City Council member Fortenberry commented, "While this ordinance is a well[-]intended effort by parents who have concern for their young children, its implications go way beyond its intended purpose." *Minutes of the Regular Lincoln City Council Meeting: Verbatim Comments During Voting Session on Amending Chapter 9.20 of the LMC by Adding a New Section Numbered 9.20.090*, at 2, 6, 10 (Sept. 14, 1998).

I also find that the city's interest in protecting very young children from frightening images is constitutionally important; that is, the interest is "significant," "compelling," and "legitimate." [9] For example, the United States Supreme Court has recognized "that there is a compelling interest in protecting the physical and psychological well-being of minors." *Sable Communications of California, Inc. v. Federal Communications Comm'n*, 492 U.S. 115, 126, 109 S.Ct. 2829, 106 L.Ed.2d 93 (1989). In another case, the Court stated: "[W]e have repeatedly recognized the governmental interest in protecting children from harmful materials." *Reno v. American Civil Liberties Union*, 521 U.S.

844, 117 S.Ct. 2329, 2346, 138 L.Ed.2d 874 (1997).

In fact, the plaintiffs concede: "There is no question here that the protection of children would qualify as a significant government interest, and in fact, there is really [no] question it would qualif[y] as a compelling government interest." (Prelim. Inj. Hr'g Tr. 8.) As for gruesome and frightening images displayed to very young children on a sidewalk as they are about to enter a church, the plaintiffs' counsel also conceded that he "can imagine a sign that is so gruesome that the City can justifiably ban it," such as "a dead fetus" or "pictures you see from the holocaust." (TRO Hr'g Tr. 64:4–9.)

Thus, the testimony received by the Lincoln City Council regarding the activity at Westminster Presbyterian Church, the language of the ordinance, and the city council's comments during the voting session on the ordinance establish that the interest sought to be served by the ordinance is protecting very young children from viewing graphic signs displayed by picketers upon the childrens' entrance to, or exit from, church. Such an interest is a constitutionally important one.

#### c. Narrowly Tailored

▇▇▇▇ "A statute is narrowly tailored if it targets and eliminates no more than the exact source of the 'evil' it seeks to remedy." *Frisby*, 487 U.S. at 485, 108 S.Ct. 2495 (quoting *Members of City Council v. Taxpayers for Vincent*, 466 U.S. 789, 807, 104 S.Ct. 2118, 80 L.Ed.2d 772 (1984)). The narrow-tailoring requirement is satisfied when the governmental regulation "promotes a substantial government interest that would be achieved less effectively absent the regulation." *Ward*, 491 U.S. at 799, 109 S.Ct. 2746 (internal quotation and citation omitted). However, this standard "does not mean that a time, place, or manner regulation may burden substantially more speech than is necessary to further the government's legitimate interests. Government may not regulate expression in such a manner that a substantial

9. Assuming the images are not gruesome, I do not agree that the city has a legitimate interest in shielding young children from the mere presence of persons carrying signs on the sidewalk. Absent a picture of a dead body or the like, there is no credible and unbiased evidence that the mere presence of a sign-carrying antiabortion protestor harms young children.

portion of the burden on speech does not serve to advance its goals." *Id.* Yet, this "narrowly tailored" analysis does not require a court to decide whether there are alternative methods of regulation that would achieve the desired end, but would be less restrictive of the plaintiffs' First Amendment rights. *Id.* at 797, 109 S.Ct. 2746.

> This less-restrictive-alternative analysis ... has never been a part of the inquiry into the validity of a time, place, and manner regulation. Instead, our cases quite clearly hold that restrictions on the time, place, or manner of protected speech are not invalid simply because there is some imaginable alternative that might be less burdensome on speech.

*Id.* (internal quotation and citations omitted) (ellipses in original).

■ In other words, an ordinance regulating speech will not be held invalid simply because there may be a better way to regulate it. Rather, the test is whether a major part of the regulation's impact on speech fails to achieve the legitimate goals set by the government and instead bars substantially more speech than is necessary. So, for example, we must ask (1) whether the ban bars speech directed at adults, while failing to protect children, or (2) whether the ban significantly impacts adults—and even children—who wish to receive the prohibited speech.

■ Ordinance 17413 would prohibit a person, on the public sidewalks and streets abutting a religious premises during certain times, from passively holding a sign or banner that does not frighten children in any way, but may persuade adults to adopt the viewpoint of the speaker. For example, the ordinance bans signs saying, "Please Follow the Lord's Teachings" and other messages or images, no matter how innocuous to young children. Yet the ordinance does not ban a protestor from handing a young child a leaflet containing gruesome pictures of a dead fetus. Moreover, even messages that a congregation wants to see are banned. For example, the ordinance bars a Catholic priest

from displaying to his willing flock on the cathedral sidewalk shortly before mass a sign that states: "Abortion is Wrong." [10]

The ordinance, then, fails in two respects. First, the ordinance bans speech that is harmless to very young children, yet potentially significant to adults, while failing to prohibit other speech (leaflets with pictures of aborted fetuses) that may terrorize a child. Second, the ban impacts all people who desire to receive the speech during "scheduled religious activities." Thus, the Lincoln ordinance does not "target[ ] and eliminate[ ] no more than the exact source of the 'evil' it seeks to remedy." *Frisby*, 487 U.S. at 485, 108 S.Ct. 2495 (quoting *Members of City Council v. Taxpayers for Vincent*, 466 U.S. 789, 807, 104 S.Ct. 2118, 80 L.Ed.2d 772 (1984)). Stated another way, the city has attempted to "regulate expression in such a manner that a substantial portion of the burden on speech does not serve to advance its goals." *Ward*, 491 U.S. at 799, 109 S.Ct. 2746.

Therefore, the ordinance is not narrowly tailored to serve the constitutionally important governmental interest of protecting children from horrifying graphic images upon entry to, and exit from, church. While the government has a significant interest in protecting children from harmful materials, "that interest does not justify an unnecessarily broad suppression of speech addressed to adults." *Reno v. American Civil Liberties Union*, 521 U.S. 844, 117 S.Ct. 2329, 2346, 138 L.Ed.2d 874 (1997). Or, as the Supreme Court said when striking down a ban on signs around its own building, a "total ban [on signs] is no more necessary for the maintenance of peace and tranquility on the public sidewalks surrounding the [Supreme Court] than on any other sidewalks in the city." *Grace*, 461 U.S. at 182, 103 S.Ct. 1702.

Defendants argue that the court should extend the specific holding of *Frisby v. Schultz*, 487 U.S. 474, 108 S.Ct. 2495, 101 L.Ed.2d 420 (1988), to this case. *Frisby* involved an ordinance that made it unlawful

---

**10.** In fact, the ordinance bars the priest from displaying his anti-abortion sign on the *church's* premises shortly before, during, and shortly after mass. The ordinance bans "focused picketing" on "the religious organization's exterior premis-

es, including its parking lots." The defendants essentially concede that this portion of this ordinance is unconstitutional. (Prelim. Inj. Hr'g Tr. 30:2–6.)

**1102**

to picket "before or about the residence or dwelling of any individual in the Town of Brookfield." The Supreme Court found the ordinance to be content-neutral and construed the ban to be limited to "focused picketing" occurring in front of a particular residence. The court found that, as narrowed, the ordinance was narrowly tailored to serve the significant government interest of protecting residential privacy. " 'The State's interest in protecting the well-being, tranquility, and privacy of the home is certainly of the highest order in a free and civilized society.' " *Id.* at 484, 108 S.Ct. 2495 (quoting *Carey v. Brown,* 447 U.S. 455, 471, 100 S.Ct. 2286, 65 L.Ed.2d 263 (1980)). The defendants argue that the state has a similar interest in protecting one's "religious home."

In the absence of authority from a higher court to do so, I do not believe it is proper to analogize private residences to other places, like churches. In *Frisby,* the speech was directed at the residents of a home when the listener had no means of avoiding the unwanted speech. *See Frisby,* 487 U.S. at 484 & 487, 108 S.Ct. 2495 ("Although in many locations, we expect individuals simply to avoid speech they do not want to hear, the home is different.... The resident is figuratively, and perhaps literally, trapped within the home, and because of the unique and subtle impact of such picketing is left with no ready means of avoiding the unwanted speech.") (internal citations omitted). It is at best an imperfect analogy to suggest that adults and children attending church are similar to the residents of a home.

Extending the "residential captive audience" holding in *Frisby* to churches would be a gateway to government regulation of expressive activity at many places where adults and their children must go to receive the essentials of life—a welfare office where parents and children go to receive food stamps, a school where children and their parents go to educate the young, or a doctor's office where children must go with their parents for medical care. Keeping in mind the fact that children are ubiquitous, the implications of extending *Frisby* beyond its facts, and the

lack of precedent for extending *Frisby,* I decline to assume that churches, or anyplace else, are like homes for First Amendment purposes.

The defendants also argue that they have done the best they can; that is, if they sought to ban only gruesome images, the effort would be struck down as an unconstitutional content-based restriction. Therefore, the defendants argue that they must draw the ban broadly to prohibit innocuous speech and speech which the listener desires to hear in order to get at the speech which frightens children. There are two responses to this argument, and both suggest the inherent weakness of it.

Initially, and assuming for the sake of argument that a ban on gruesome pictures is content-based, the courts have never categorically prohibited content-based regulation of speech when it comes to children. *See, e.g., Reno,* 117 S.Ct. at 2346 ("[W]e have repeatedly recognized the governmental interest in protecting children from harmful materials.") While content-based restrictions are difficult to defend, it does not therefore follow that a ban on more speech than is necessary is justified.

Furthermore, the defendants' argument—we cannot effectively ban gruesome pictures that frighten children without banning a great deal of other speech—is not accurate. For example, the courts have explicitly upheld content-neutral narrowly tailored ordinances that create limited buffer zones for church entrances while allowing the adjacent sidewalk to carry the full range of speech customarily protected in that public forum. *See, e.g., Edwards v. City of Santa Barbara,* 150 F.3d 1213, 1215–1216 (9th Cir.1998) (city ordinance that prohibited demonstration activity within eight feet of entrances to places of worship was narrowly tailored to city's interest in ensuring access to religious worship and permitted ample alternative avenues of communication by placing no limit on speech or expressive activity outside narrow zone). There is no reason to think that a limited buffer zone ordinance could not be drafted that would effectively [11] shield chil-

11. As stated earlier, Westminster attorney Alan Peterson testified before the Lincoln City Council that "it was the *close proximity* of the big signs or whatever form of material being involved was frightening, disturbing children." *Minutes of the Regular Lincoln City Council Meeting: Verbatim Comments During Voting Session on Amending*

dren from having to pass by pictures of aborted fetuses in front of a church entrance, while still allowing protestors to use signs on the remaining portion of the sidewalk adjoining the church outside the buffer zone.[12]

#### d. Alternative Channels of Communication

The ordinance is not narrowly tailored to serve a constitutionally important government interest. Therefore, it is unnecessary to determine whether the ordinance leaves open ample alternative channels of communication.

Nevertheless, the ordinance effectively bans all signs around a large city block that is adjacent to a heavily traveled four-lane highway. Thus, the ability of protestors to communicate with those who drive by the busy streets adjoining the Westminster church has been significantly curtailed. To illustrate the pernicious nature of this ban, if the City of Lincoln's ordinance were imposed in New York City, protestors would be barred from displaying signs on the city block covered by St. Patrick's Cathedral 53 times a week when masses are taking place [13] within that huge building.[14] To say that such an ordinance meets constitutional muster because one can engage in other expressive activity is to wrongly depreciate the constitutional significance of public sidewalks and signs and banners. *Grace,* 461 U.S. at 182, 103 S.Ct. 1702 (declaring unconstitutional a ban that prohibited display of "any flag, banner, or device designed or adapted to bring into public notice any party, organization, or movement" on public sidewalks constituting outer boundary of the grounds of the Supreme Court, despite the fact that other expressive activity was not prohibited).

#### e. Conclusion Regarding Likely Success on Merits

Because Lincoln Municipal Code 9.20.090, also known as Ordinance No. 17413, is not narrowly tailored to serve an important gov-

*Chapter 9.20 of the LMC by Adding a New Section Numbered 9.20.090,* at 2 (Sept. 14, 1998) (emphasis added).

12. In so stating, I do not use a "least-rest rictive-alternatives" test. Rather, I use this analysis to illustrate the weakness of the defendants' argument that the ban prohibits no more speech than is necessary.

ernment interest, in violation of the Free Speech Clause of the First Amendment, the plaintiffs are reasonably likely to succeed on the merits of their free-speech claim.

#### 2. Irreparable Harm to the Plaintiffs

"The loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury." *Elrod v. Burns,* 427 U.S. 347, 373, 96 S.Ct. 2673, 49 L.Ed.2d 547 (1976) (plurality). *See also Marcus v. Iowa Public Television,* 97 F.3d 1137, 1140 (8th Cir.1996) (citing *Elrod* and stating that if congressional candidates who moved for injunctive relief were denied their First Amendment rights when they were excluded from appearance on public television with other political candidates, they have suffered an irreparable injury under *Dataphase* ); *Kirkeby v. Furness,* 52 F.3d 772, 775 (8th Cir.1995) (district court should have granted demonstrators' motion to enjoin enforcement of city ordinance restricting residential picketing; citing *Elrod* and stating that since demonstrators' right to speak had probably been violated, they would suffer irreparable injury under *Dataphase* if injunction did not issue).

Because I have concluded that the municipal ordinance at issue is not narrowly tailored to serve an important government interest, enforcement of the ordinance against the plaintiffs would deny them their First Amendment free-speech rights. Therefore, if a preliminary injunction barring enforcement of this ordinance did not issue, the plaintiffs would suffer irreparable harm under *Dataphase.*

#### 3. Harm to the Defendants

If the court issues a preliminary injunction barring enforcement of Ordinance No. 17413, the defendants simply lose an opportunity to prosecute violators of new

13. This information is taken from the automated information system made available to the public. (St. Patrick's Cathedral, 460 Madison Ave., New York, N.Y., telephone number 1–212–753–2261.)

14. And, as noted earlier, this would be true *even if* the worshipers wanted to receive the speech.

Lincoln Municipal Code § 9.20.090 while the court decides whether the plaintiffs are entitled to a permanent injunction. When balanced against the risk that Plaintiffs will be denied their First Amendment free-speech rights if a preliminary injunction does not issue, this potential harm to Defendants is minimal. Moreover, given that the city has numerous ordinances that protect church-goers from threatening behavior and disturbances of the peace (exs.116–118), and the fact that the police have witnessed no threatening behavior on the part of the protestors, the harm to members of the Westminster church occasioned by issuance of the injunction is less than the harm to the plaintiffs occasioned by the failure to issue the injunction.

### 4. Public Interest

The court finds that the public interest in avoiding violation of the plaintiffs' First Amendment free-speech rights while the court considers the plaintiffs' request for a permanent injunction, and the public interest in encouraging laws to be written and passed in a constitutionally acceptable manner, outweigh the arguably significant public interest in enabling families to approach and exit their place of worship without fearing the effects of "focused" picketing upon their young children. This is particularly true because there is unbiased evidence from the city's chief of police stating that the allegations of the church members about improper conduct on the part of protestors cannot be documented.

### B. "Facial" or "As Applied" Challenge

Plaintiffs in this case seek to bring a "facial" challenge to the city ordinance at issue because, they argue, there has not yet been a prosecution under the ordinance, leaving Plaintiffs with "no ability to have an as-applied challenge." (TRO Hr'g Tr. 29:13–25.) Based on my findings above, I will invalidate the ordinance on its face, but for different reasons than that suggested by Plaintiffs.

Outside the First Amendment free-speech context, a plaintiff challenging the constitutionality of a statute may bring an "as-applied" or "facial" challenge. A plaintiff bringing an "as-applied" challenge contends that the statute would be unconstitutional under the circumstances in which the plaintiff has acted or proposes to act. If a statute is held unconstitutional "as applied," the statute may not be applied in the future in a similar context, but the statute is not rendered completely inoperative. *Ada v. Guam Soc'y of Obstetricians & Gynecologists*, 506 U.S. 1011, 1012, 113 S.Ct. 633, 121 L.Ed.2d 564 (1992) (Scalia, J., Rehnquist, C.J., and White, J., dissenting from denial of petition for writ of certiorari).

In contrast, a "facial" constitutional challenge outside the First Amendment free-speech context is used when a plaintiff seeks to render a statute utterly inoperative. Facial challenges must be rejected "unless there exists *no set of circumstances* in which the statute can constitutionally be applied." *Id.* (emphasis in original).

> The only exception to this rule recognized in our jurisprudence is the facial challenge based upon First Amendment free-speech grounds. We have applied to statutes restricting speech a so-called 'overbreadth' doctrine, rendering such a statute invalid in all its applications (i.e., facially invalid) if it is invalid in any of them.

*Id.* (citing *Gooding v. Wilson*, 405 U.S. 518, 521, 92 S.Ct. 1103, 31 L.Ed.2d 408 (1972)).

Under the "free speech" exception to the "facial challenge" standard, a plaintiff may challenge a statute's vagueness or overbreadth as applied to others.

> "Although a statute may be neither vague, overbroad, nor otherwise invalid as applied to the conduct charged against a particular defendant, he is permitted to raise its vagueness or unconstitutional overbreadth as applied to others. And if the law is found deficient in one of these respects, it may not be applied to him either, until and unless a satisfactory limiting construction is placed on the statute. The statute, in effect, is stricken down on its face. This result is deemed justified since the otherwise continued existence of the statute in unnarrowed form would tend to suppress constitutionally protected rights."

*Gooding v. Wilson*, 405 U.S. 518, 520–23, 92 S.Ct. 1103, 31 L.Ed.2d 408 (1972) (quoting

*Coates v. City of Cincinnati,* 402 U.S. 611, 619–20, 91 S.Ct. 1686, 29 L.Ed.2d 214 (1971) (White, J., dissenting) (citation omitted)). *See also Members of City Council v. Taxpayers for Vincent,* 466 U.S. 789, 799, 104 S.Ct. 2118, 80 L.Ed.2d 772 (1984) (justification for allowing plaintiff to challenge statute on behalf of others based on First Amendment "overbreadth doctrine" is " 'a judicial prediction or assumption that the statute's very existence may cause others not before the court to refrain from constitutionally protected speech or expression.' ") (quoting *Broadrick v. Oklahoma,* 413 U.S. 601, 612, 93 S.Ct. 2908, 37 L.Ed.2d 830 (1973)).

■ Although courts and commentators often address the issue of facial challenges in the First Amendment context in a confusing manner, a review of numerous cases discussing such challenges has evidenced at least some guidelines for determining whether a law implicating the First Amendment should be invalidated on its face or as applied. *Broadrick v. Oklahoma,* 413 U.S. 601, 615, 93 S.Ct. 2908, 37 L.Ed.2d 830 (1973) ("It remains a matter of no little difficulty to determine when a law may properly be held void on its face and when such summary action is inappropriate." (internal quotation marks and citation omitted)). These guidelines are as follows:

1. "Facial" or "overbreadth" challenges to statutes in the First Amendment context have been used in cases in which (a) plaintiffs whose speech validly may be prohibited or sanctioned (i.e ., "unprotected speech") challenge a statute or ordinance because the statute or ordinance threatens others who are *not before the court, Brockett v. Spokane Arcades, Inc.,* 472 U.S. 491, 503, 105 S.Ct. 2794, 86 L.Ed.2d 394 (1985); *Secretary of State of Maryland v. Joseph H. Munson Co., Inc.,* 467 U.S. 947, 956–57, 104 S.Ct. 2839, 81 L.Ed.2d 786 (1984), and (b) plaintiffs challenge a statute that in all its applications directly restricts protected First Amendment activity, *Munson,* 467 U.S. at 965 n. 13, 104 S.Ct. 2839. *See also Members of City Council v. Taxpayers for Vincent,* 466 U.S. 789, 796, 104 S.Ct. 2118, 80 L.Ed.2d 772 (1984) (a statute or ordinance may be considered invalid "on its face" in two ways: the statute or ordinance may be unconstitutional in every conceivable application, or may be unconstitutionally overbroad because the statute or ordinance seeks to prohibit such a broad range of protected conduct). A statute that is void for overbreadth is one that "offends the constitutional principle that 'a governmental purpose to control or prevent activities constitutionally subject to state regulation may not be achieved by means which sweep unnecessarily broadly and thereby invade the area of protected freedoms.' " *Zwickler v. Koota,* 389 U.S. 241, 250, 88 S.Ct. 391, 19 L.Ed.2d 444 (1967) (quoting *National Ass'n for Advancement of Colored People v. Alabama,* 377 U.S. 288, 307, 84 S.Ct. 1302, 12 L.Ed.2d 325 (1964)).

2. In contrast, when a statute or ordinance is challenged by plaintiffs (a) who engage in protected speech that the overbroad statute or ordinance seeks to punish or (b) who seek to engage in both protected and unprotected speech, there exists a proper party to challenge the statute and there is no concern that an attack on the statute will be unduly delayed or that protected speech will be discouraged. Under these circumstances, a facial challenge is not appropriate; instead, the statute or ordinance will "be declared invalid to the extent that it reaches too far, but otherwise left intact." *Brockett,* 472 U.S. at 503–04, 105 S.Ct. 2794. If the court finds nothing in the record to indicate that a statute or ordinance will have a different impact on third parties' interests in free speech than it has on the plaintiffs themselves, the court will not entertain a facial challenge based on overbreadth. *Members of City Council v. Taxpayers for Vincent,* 466 U.S. 789, 801, 104 S.Ct. 2118, 80 L.Ed.2d 772 (1984) (court deemed challenge to ordinance prohibiting posting of signs on public property to be as-applied challenge, rather than facial challenge based on overbreadth, when there was no evidence the ordinance would have different impact on third parties than on plaintiffs themselves; when plaintiffs failed to demonstrate that ordinance applied to any conduct more likely to be protected under the First Amendment; and when plaintiffs failed to argue that the ordinance can never be validly applied).

3. In some cases the United States Supreme Court has not invoked the facial overbreadth doctrine when "a limiting construction has been or could be placed on the challenged statute." *Broadrick v. Oklahoma,* 413 U.S. 601, 613, 93 S.Ct. 2908, 37 L.Ed.2d 830 (1973) (collecting cases); *United Food & Comm'l Workers Int'l Union v. IBP, Inc.,* 857 F.2d 422, 431 (8th Cir.1988). " '[A] state statute should be deemed facially invalid only if (1) it is not readily subject to a narrowing construction by the state courts and (2) its deterrent effect on legitimate expression is both real and substantial.' " *Kirkeby v. Furness,* 52 F.3d 772, 775 (8th Cir.1995) (quoting *United Food,* 857 F.2d at 431). Federal courts must remember that they are "generally without authority to construe or narrow state statutes"; that they "may not impose [their] own narrowing construction ... if the state courts have not already done so"; and that their role in a case involving a state statute which has not been construed by the state courts is to determine if a construction urged by the parties is "reasonable and readily apparent" from the language and legislative history of the statute and the applicable rules of statutory construction. *United Food,* 857 F.2d at 431–32 (finding portions of statute facially overbroad when it was beyond federal court's power to rewrite the broad, straightforward language of the statute in order to avoid constitutional difficulties created by the statute's plain meaning) (internal quotation marks and citations omitted).

4. In deciding whether an overbreadth challenge should be allowed in a particular case, the United States Supreme Court has "weighed the likelihood that the statute's very existence will inhibit free expression." *Members of City Council v. Taxpayers for Vincent,* 466 U.S. 789, 799, 104 S.Ct. 2118, 80 L.Ed.2d 772 (1984). " '[T]he overbreadth of a statute must not only be real, but substantial as well, judged in relation to the statute's plainly legitimate sweep.' " *Id.* at 799–800, 104 S.Ct. 2118 (quoting *Broadrick v. Oklahoma,* 413 U.S. 601, 615, 93 S.Ct. 2908, 37 L.Ed.2d 830 (1973)). While "substantial overbreadth" is not easily defined, it is clear that "the mere fact that one can conceive of some impermissible applications of a statute is not sufficient to render it susceptible to an overbreadth challenge." *Id.* at 800, 104 S.Ct. 2118. Instead, the law must reach " 'substantially beyond the permissible scope of legislative regulation' " and "there must be a realistic danger that the statute itself will significantly compromise recognized First Amendment protections of parties not before the Court for it to be facially challenged on overbreadth grounds." *Id.* at 800 n. 19 & 801, 104 S.Ct. 2118 (quoting Jeffries, *Rethinking Prior Restraint,* 92 Yale L.J. 409, 425 (1983)) (emphasis in case). A court will not strike down an ordinance on overbreadth grounds if the statute's legitimate reach "dwarfs its arguably impermissible applications." *Excalibur Group, Inc. v. City of Minneapolis,* 116 F.3d 1216, 1224 (8th Cir.1997) (internal quotation marks and citation omitted), *cert. denied,* —— U.S. ——, 118 S.Ct. 855, 139 L.Ed.2d 755 (1998). "Because the overbreadth doctrine has far-reaching ramifications, however, it is strong medicine that should be employed only with hesitation, and then only as a last resort." *Excalibur Group, Inc.,* 116 F.3d at 1223 (internal quotation marks and citations omitted).

5. The "normal rule" is that partial, rather than facial, invalidation of a statute or ordinance is the required course, except when partial invalidation would be contrary to legislative intent, as when the "legislature had passed an inseverable Act or would not have passed it had it known the challenged provision was invalid." *Brockett,* 472 U.S. at 504 & 506, 105 S.Ct. 2794. Further, a federal court should not extend invalidation of a statute or ordinance more broadly than necessary in order to dispose of the particular case before it. Rather, if a court deems a statute or ordinance unconstitutional in part, and if the constitutional and unconstitutional parts are "wholly independent of each other," the constitutional portion may stand, while the unconstitutional portion should be rejected. *Id.* at 502, 105 S.Ct. 2794 (internal quotation marks and citation omitted). " 'It is not the usual judicial practice, ... nor do we consider it general-

ly desirable to proceed to an overbreadth issue unnecessarily—that is, before it is determined that the statute would be valid as applied.'" *Jacobsen v. Howard,* 109 F.3d 1268, 1274 (8th Cir.1997) (quoting *Board of Trustees v. Fox,* 492 U.S. 469, 484–85, 109 S.Ct. 3028, 106 L.Ed.2d 388 (1989)) (concluding that statutes were invalid as applied and it was therefore inappropriate to consider overbreadth challenge).

Application of each of the above five factors to the factual situation before the court yields opposite results. For instance, under factors (1) and (2), above, the court should invalidate the ordinance "as applied" because Plaintiffs seek to engage in protected speech that the Lincoln ordinance seeks to regulate. Further, there is no evidence that the ordinance will have a different impact on third parties' interests in free speech than it has on Plaintiffs themselves.[15] Therefore, there exist proper parties to challenge the ordinance on their own behalf, and it is not appropriate to entertain a facial challenge to the ordinance brought on behalf of others who are not before the court.

In contrast, application of the third and fourth factors to this case dictate that the court facially invalidate the ordinance. The ordinance can be deemed facially invalid only if "'(1) it is not readily subject to a narrowing construction by the state courts and (2) its deterrent effect on legitimate expression is both real and substantial.'" *Kirkeby v. Furness,* 52 F.3d 772, 775 (8th Cir.1995) (quoting *United Food,* 857 F.2d at 431). The Nebraska courts in this instance have not construed or narrowed the ordinance in any fashion. Defendants' suggestion that this court strike that portion of the ordinance prohibiting focused picketing "of a scheduled religious activity at any time within the period from one-half hour before to one-half hour after the scheduled activity, at any place ... *on the religious organization's exterior premises,* including its parking lots," City of Lincoln Ordinance No. 17413 § 2 (Sept. 21, 1998) (emphasis added), contradicts the principle that federal courts are "generally without authority to construe or narrow state statutes" and that they "may not impose

[their] own narrowing construction ... if the state courts have not already done so." *United Food,* 857 F.2d at 431–32.

Even if the court did consider the defendants' proposed narrowing construction, it would conclude that the construction is not "reasonable and readily apparent" from the language and legislative history of the ordinance. There is no indication in the transcripts from the public hearings and voting session on the ordinance that it is reasonable to "construe" the ordinance to not include the above provision. The transcripts reflect much testimony about the display of large and horribly graphic images in the parking lot of Westminster Presbyterian Church. As discussed above, the ordinance at issue was enacted to regulate this very type of visual display. Deleting the above provision from the ordinance is simply not "reasonable and readily apparent" from the language and legislative history of the ordinance. *United Food & Comm'l Workers Int'l Union v. IBP, Inc.,* 857 F.2d 422, 431–32 (8th Cir.1988) (finding portions of statute facially overbroad when it was beyond federal court's power to rewrite the broad, straightforward language of the statute in order to avoid constitutional difficulties created by the statute's plain meaning) (internal quotation marks and citations omitted). Thus, the ordinance is not readily subject to a narrowing construction, and the first prong of the *Kirkeby* test is satisfied.

Most importantly, and as discussed above in the court's analysis of the merits of the plaintiffs' First Amendment free-speech claim, a substantial portion of the burden on legitimate speech caused by the Lincoln ordinance does not serve to advance the Lincoln City Council's goals in enacting the ordinance. Due to its expansive reach, the ordinance's "deterrent effect on legitimate expression is both real and substantial," the second prong of the *Kirkeby* test. In this regard, I emphasize that the ban prohibits members of other religious sects from receiving speech on the sidewalks adjacent to their churches *even if* they fervently desire to receive the speech.

---

**15.** However, I note that the plaintiffs apparently do not carry signs with gruesome pictures, while their colleagues, who are not parties, do carry those types of signs.

Under factors (4) and (5), then, the ordinance could be deemed facially invalid. This conclusion is buttressed by looking at whether the overbreadth of the ordinance is real and substantial in relation to its "'plainly legitimate sweep.'" *Members of City Council v. Taxpayers for Vincent,* 466 U.S. 789, 799–800, 104 S.Ct. 2118, 80 L.Ed.2d 772 (1984) (quoting *Broadrick v. Oklahoma,* 413 U.S. 601, 615, 93 S.Ct. 2908, 37 L.Ed.2d 830 (1973)). As stated above, the Lincoln ordinance reaches substantially beyond the constitutionally permissible scope of regulation, and it cannot be said that the ordinance's legitimate reach "dwarfs its arguably impermissible applications." *Excalibur Group, Inc. v. City of Minneapolis,* 116 F.3d 1216, 1224 (8th Cir.1997) (internal quotation marks and citation omitted). In fact, the opposite is true.

Finally, the rule that partial, rather than facial, invalidation of an ordinance—the fifth factor above—is the required course is not applicable here because the court cannot lift unconstitutional "parts" of the ordinance from wholly independent constitutional parts. Rather, the entire statute is not narrowly tailored to serve a significant government interest.

After consideration of the above factors, I conclude that the ordinance is facially void for overbreadth because it "offends the constitutional principle that 'a governmental purpose to control or prevent activities constitutionally subject to state regulation may not be achieved by means which sweep unnecessarily broadly and thereby invade the area of protected freedoms.'" *Zwickler v. Koota,* 389 U.S. 241, 250, 88 S.Ct. 391, 19 L.Ed.2d 444 (1967). As discussed above, the ordinance's "plainly legitimate sweep"—protecting young children from graphic and disturbing images—is overshadowed by the effect this ordinance has on all types of speech conveyed via "a banner, placard, sign or other demonstrative material" around religious premises, and on the people who wish to hear such speech. Further, the ordinance has not been subject to a narrowing construction by the state courts, nor can it be by this court, and the ordinance's deterrent effect on display of all types of expression conveyed by all types of demonstrative material on or around religious premises is both real and substantial. Accordingly, the ordinance is facially invalid.

## III. CONCLUSION

After analyzing the factors for granting preliminary injunctive relief set out in *Dataphase Systems, Inc. v. CL Systems, Inc.,* 640 F.2d 109 (8th Cir.1981), I conclude that a preliminary injunction should issue, barring enforcement of Lincoln City Ordinance No. 17413, which created Lincoln Municipal Code § 9.20.090, because the ordinance is not narrowly tailored to serve an important government interest, in violation of the Free Speech Clause of the First Amendment, and is therefore facially invalid. Thus, the plaintiffs are reasonably likely to succeed on the merits of their free-speech claim. Further, when balanced against the risk that Plaintiffs will be denied their First Amendment free-speech rights if a preliminary injunction does not issue, the potential harm to Defendants is minimal if the preliminary injunction is granted. Finally, the public interest in avoiding violation of the plaintiffs' First Amendment free-speech rights while the court considers the plaintiffs' request for a permanent injunction weighs in favor of issuing a preliminary injunction.

IT IS ORDERED:

1. Plaintiffs' request for a preliminary injunction is granted as provided herein;

2. Defendants, and each of them, including their agents, servants, and employees, are preliminarily enjoined from enforcing Lincoln City Ordinance No. 17413, which created Lincoln Municipal Code § 9.20.090, against any person; and

3. The court determines under Fed. R.Civ.P. 65 that a bond in the amount of $500 is sufficient and directs Plaintiffs to post such a bond.