# United States Court of Appeals
## FOR THE EIGHTH CIRCUIT

_____

No. 98-4112NE

_____

Marilyn Olmer, an Individual; John   *
Kelly, an Individual; Theresa Lane,   *
an Individual; and Michelle Mann,   *
an Individual,   *
  *
       Appellees,   *
  * On Appeal from the United
     v.   * States District Court
  * for the District of
City of Lincoln, a Municipality;   * Nebraska.
William Austin, in his official capacity   *
as Lincoln City Attorney; and Thomas   *
Casady, in his official capacity as   *
Chief of the Lincoln Police Department,   *
  *
       Appellants.   *

_____

Submitted: June 17, 1999
Filed: October 14, 1999

_____

Before RICHARD S. ARNOLD, BRIGHT, and ROSS, Circuit Judges.

_____

RICHARD S. ARNOLD, Circuit Judge.


This is an appeal from a preliminary injunction enjoining the enforcement of an ordinance of the City of Lincoln, Nebraska. The ordinance seeks to restrict to certain

areas the "focused picketing" of churches and other religious premises thirty minutes before, during, and thirty minutes after any scheduled religious activity. The District Court[1] held that the ordinance was facially invalid because it violated the Free Speech Clause of the First Amendment. For substantially the same reasons given in the District Court's thorough Memorandum and Order, we affirm.

## I.

The plaintiffs are four individuals who have engaged in demonstrations opposing abortion in the vicinity of Westminster Presbyterian Church in Lincoln, Nebraska. The plaintiffs believe that abortion is wrong, and they object to the appointment of Winston Crabb, M.D., a physician who performs abortions, as a deacon and elder in the church. The plaintiffs have engaged in protests and demonstrations on the public sidewalk that adjoins the church, carrying signs which read, "Winston Crabb, Abortionist and Elder," "1 Corinthians 5:13," "Dr. Crabb is Unfit to be an Elder," "Jesus Loves the Little Children," and "Life." Other protesters (not the plaintiffs) have demonstrated near the church with other kinds of signs, including graphic representations of aborted fetuses. The church objected to all of these demonstrations, and eventually these objections came to the attention of the Lincoln City Council. The Council then passed the ordinance at issue in this case, City of Lincoln Ordinance No. 17413 (September 21, 1998). The Mayor of Lincoln, Mike Johanns, vetoed the ordinance, but the Council overrode his veto, and the ordinance became law as Section 9.20.090 of the Lincoln Municipal Code.

The ordinance at issue states, in pertinent part:

---

[1]The Hon. Richard G. Kopf, United States District Judge for the District of Nebraska. The opinion of the District Court is reported at 23 F. Supp. 2d 1091 (D. Neb. 1998).

Section 1. Legislative Intent and Findings.

(a)     It is the intent of this ordinance to preserve the peace at religious premises in order to protect and secure several significant and compelling interests of this city.  Those interests include the health, safety and welfare of all the citizens and especially of children, all citizens' freedoms of expression, assembly, association and religion, and the ordinary, good public order of the community.

. . .

(d)     . . . This ordinance restricts a particular manner of picketing defined herein as focused picketing, and only when performed in specified time periods and in specified places in close proximity to religious premises, for the reason that without a reasonable buffer zone of time and space, focused picketing disrupts and endangers or outright destroys individual freedom of religion.

(e)     The mechanism of such injury to individual freedom of religion operates as follows: infants and young children are emotionally vulnerable to focused picketing in close proximity to them, which is a typical characteristic of  focused picketing at religious premises, and many of these children tend to react with fear, unhappiness, anxiety and other emotional disturbance when such activity is imposed on them.  Families with infants and young children who must pass through the ring of focused picketing in order to attend or leave religious activities are for the time of entrance to the time of departure, captive audiences.  Their option of foregoing their worship or other religious activity on the one hand, or risking pain and injury to their children on the other, amounts to a substantial and intolerable burden on their personal religious freedom.

Section 2. . . .

9.20.090   Disturbing the Peace by Focused Picketing at Religious Premises.

(a) Definitions.  . . .

(3)  The term "focused picketing" shall mean "the act of one or more persons stationing herself, himself or themselves outside religious premises on the exterior grounds, or on the sidewalks, streets or other part of the right of way in the immediate vicinity of religious premises, or moving in a repeated manner past or around religious premises, while displaying a banner, placard, sign or other demonstrative material as a part of their expressive conduct."  The term "focused picketing" shall not include distribution of leaflets or literature.

(b)  It shall be deemed an unlawful disturbance of the peace for any person intentionally or knowingly to engage in focused picketing of a scheduled religious activity at any time within the period from one-half hour before to one-half hour after the scheduled activity, at any place (1) on the religious organization's exterior premises, including its parking lots; or (2) on the portion of the right of way including any sidewalk on the same side of the street and adjoining the boundary of the religious premises, including its parking lots; or (3) on the portion of the right of way adjoining the boundary of the religious premises which is a street or roadway including any median within such street or roadway; . . .

Thus, the ordinance purports to make it unlawful for anyone to stand or walk on public sidewalks or rights of way adjoining religious premises, if that person is displaying a banner, placard, or sign, at certain specified times.  It does not matter whether children are the target of this activity, or even whether they are present at any particular time.  Nor does it matter whether the words or pictures on the banner, placard, or sign are in any way gruesome or repulsive to children, or, instead, completely benign and bland.

II.

It is undisputed that peaceful picketing is an expressive activity protected by the First Amendment.  In addition, the areas identified by the ordinance, such as sidewalks and public rights of way, "have immemorially been held in trust for the use of the public

-4-

and, time out of mind, have been used for purposes of assembly, communicating thoughts between citizens, and discussing public questions." Hague v. CIO, 307 U.S. 496, 515 (1939) (opinion of Roberts, J.). Consequently, these places are regarded as public fora, and the government's ability to regulate speech in such places is limited.

> In these quintessential public forums, the government may not prohibit all communicative activity. For the State to enforce a content-based exclusion it must show that its regulation is necessary to serve a compelling state interest and that it is narrowly drawn to achieve that end. . . . The State may also enforce regulations of the time, place, and manner of expression which are content-neutral, are narrowly tailored to serve a significant government interest, and leave open ample alternative channels of communication.

Perry Education Assoc. v. Perry Local Educators' Assoc., 460 U.S. 37, 45 (1983) (citations omitted).

The City claims that the ordinance is constitutionally valid because it is a content-neutral, narrowly tailored limitation on the time, place, and manner of speech designed to protect significant government interests. The City has identified three such interests: 1) the protection of the well-being of young children exposed to focused picketing; 2) the preservation of the right of its citizens to exercise their religion; and 3) the maintenance of public safety.

Like the District Court, we assume without deciding that the ordinance is a content-neutral regulation. Further, we agree with the District Court that "the city's interest in protecting very young children from frightening images is constitutionally important; that is, the interest is 'significant,' 'compelling,' and 'legitimate.' " 23 F. Supp. 2d at 1100 (footnote omitted). That is as far as the City's legitimate interest goes, however. As the District Court said:

> Assuming the images are not gruesome, I do not agree that the City has a legitimate interest in shielding young children from the mere presence of persons carrying signs on the sidewalk. Absent a picture of a dead body or the like, there is no credible and unbiased evidence that the mere presence of a sign-carrying antiabortion protestor harms young children.

Id. at 1100 n.9. There was testimony, offered by the City, that contradicts this finding, but it is for the District Court, in the first instance, to determine what evidence is credible, and its resolution of this issue of fact is not clearly erroneous.

The question is whether the ordinance is a "narrowly tailored" effort to protect the legitimate interest identified by the District Court. The answer is plainly no. The ordinance purports to make the carrying of signs at the indicated times and places unlawful, no matter what the signs say or depict, and this prohibition is much broader than necessary to protect the psychological interest of young children as found by the District Court. Moreover, the ordinance prohibits communication with adults as well as with children. While most of the adults attending the Westminster Presbyterian Church probably do not like the signs and disagree with them, that is hardly a sufficient basis, under the First Amendment, to justify what the City is attempting to do here. Expressive communication is frequently upsetting, even abrasive. The protection of such robust debate is at the core of the First Amendment. Finally, the ordinance bans certain forms of communication even if all of those to whom it is directed in fact wish to hear it. In sum, the ordinance bans speech directed at adults, and is not narrowly tailored to prohibit only that sort of speech that would be psychologically damaging to children. For further elaboration, see 23 F. Supp. at 1100-1102.

The City also claims that it has a legitimate interest in preserving the right of its citizens to exercise their religion freely. Such an interest, in the abstract, is

undoubtedly substantial and important. If, for example, anti-abortion protestors were to attempt to enter a church without permission, or to interrupt church services with their own speech, the city could doubtless prosecute them under a general trespass or disturbing-the-peace provision, or, if necessary, adopt a more specific prohibition directed against disturbing or interrupting services of worship. The present ordinance goes way beyond that. It goes beyond the church building and church property, and seeks to forbid peaceful communication on property belonging to the public, even though the communication may be completely truthful, and even though there is absolutely no physical interference with access to the church.

What we have said in the context of another series of demonstrations against the status quo is relevant here. In <u>Action v. Gannon</u>, 450 F.2d 1227 (8th Cir. 1971) (en banc), we dealt with protests conducted by members of the black community against a predominantly white church in St. Louis. In the course of that opinion, which was rendered by the Court en banc, we drew a distinction between the illegitimacy of actually intruding on church premises to disrupt services, and the First Amendment right to demonstrate peacefully, even when the demonstrations occur in the vicinity of a church.

Speaking through Judge Heaney, the en banc Court held as follows:

> The defendants have a right to voice their opinion that the plaintiffs have not fulfilled their obligation to the black community. The defendants also have a right to make requests upon the plaintiffs if such requests are not joined with threats to disrupt church services and are not otherwise unlawful. The fact that the requests or opinions may be offensive to the parishioners does not render them outside the protection of the First Amendment. <u>Organization for a Better Austin v. Keefe</u>, 402 U.S. 415, 91 S. Ct. 1575, 29 L.Ed.2d 1 (1971); <u>Bachellar v. Maryland</u>, 397 U.S. 564, 90 S. Ct. 1312, 25 L.Ed.2d 570 (1970); <u>Street v. New York</u>, 394 U.S. 576, 89 S. Ct. 1354, 22 L.Ed.2d 572 (1969). As the Supreme Court has said:

" . . . [A] function of free speech under our system of government is to invite dispute. It may indeed best serve its high purpose when it induces a condition of unrest, creates dissatisfaction with conditions as they are, or even stirs people to anger. Speech is often provocative and challenging. It may strike at prejudices and preconceptions and have profound unsettling effects as it presses for acceptance of an idea. That is why freedom of speech, though not absolute, . . . is nevertheless protected against censorship or punishment, unless shown likely to produce a clear and present danger of a serious substantive evil that rises far above public inconvenience, annoyance, or unrest. . . ."

Terminiello v. Chicago, 337 U.S. 1, 4, 69 S. Ct. 894, 896, 93 L.Ed. 1131 (1949).

The defendants also have a right to engage in peaceful pamphleteering and picketing on public property, so long as they do not "unduly interfere with the normal use of the public property by other members of the public with an equal right of access to it," Amalgamated Food Employees Union Local 590 v. Logan Valley Plaza, Inc., 391 U.S. 308, 320, 88 S. Ct. 1601, 1609, 20 L.Ed.2d 603 (1968), and cases cited therein, provided, of course, that they do not interfere with those entering or leaving the church.

Id. at 1232-33 (footnote omitted).

The City suggests that this passage in our Action opinion was dictum, but we cannot agree. The District Court had issued an injunction to protect the rights of churchgoers. In the main, we affirmed, but we directed the District Court, on remand, to revise the injunction to make it consistent with the views stated in the opinion, including the quoted passage. See id. at 1238. The opinion was joined by five of the six members of the en banc Court, one judge choosing to concur only in the result.

-8-

Thus, this Court in Action upheld the same First Amendment right to picket on public property near a church that plaintiffs in the present case seek to vindicate.

The City cites Frisby v. Schultz, 487 U.S. 474 (1988), in which an ordinance prohibiting focused picketing before or about a residence or dwelling was upheld by the Supreme Court, if limited to picketing occurring in front of a particular residence. Such a prohibition, the Court held, was narrowly tailored to the protection of residential privacy, which is a significant governmental interest. We cannot agree with the City that churches are indistinguishable from private residences for this purpose. As the Supreme Court said in Frisby, 487 U.S. at 484, "the home is different," and, in our view, unique. Allowing other locations, even churches, to claim the same level of constitutionally protected privacy would, we think, permit government to prohibit too much speech and other communication. We recognize that lines have to be drawn, and we choose to draw the line in such a way as to give the maximum possible protection to speech, which is protected by the express words of the Constitution.

Finally, the City asserts an interest in public order, which we take to mean, in the present context, maintaining the streets free of obstructions or distractions to traffic. Certainly this interest could, in some circumstances, be sufficient to justify some regulation of speech. The City could, for example, prohibit someone with a sign from standing in the middle of a street. No doubt the City of Lincoln has other ordinances prohibiting exactly that. The present ordinance goes far beyond such an effect. It extends to sidewalks and public rights of way, and is not limited to signs that would, on account of their size or attractiveness, be a distraction to motorists.

To summarize: If we assume, in accordance with the City's arguments, that the ordinance is content-neutral, it still cannot be upheld. The ordinance is not narrowly tailored to the protection of any significant governmental interest established by the record before us. We therefore agree with the District Court that the ordinance is

unconstitutional on its face, and the order of that Court, granting the plaintiffs's motion for a preliminary injunction, is

Affirmed.

BRIGHT, Circuit Judge, dissenting.

If speech is silver, silence may be golden. For its part, the United States Supreme Court wrote in favor of silence in Frisby v. Schultz, 487 U.S. 474 (1988). There, by finding the protection of residential privacy to be a substantial government interest, the Court shielded residents from unwanted speech in their homes. The present case raises a similar question; namely, whether an analogous principle of religious freedom applies to churchgoers, and whether the government may reasonably protect those who attend religious rites and observances at the church of their choice from unwanted messages. The answer should be a resounding yes.

## I.    BACKGROUND

I amplify the factual background, some of which has already been stated in the majority opinion.

In 1998, the City Council of Lincoln, Nebraska conducted a public hearing to consider the adoption of an ordinance prohibiting certain picketing at religious services and activities. For about a year and a half, picketers had been demonstrating outside the Westminster Presbyterian Church in Lincoln ("Westminster"). The protests occurred at the entrances, exits, and parking lot of Westminster's building. The picketers protested against abortions performed by Dr. Winston Crabb, an obstetrician/gynecologist and an elder and deacon of the church. At the hearing, many church members testified that recent picketing outside their church had become disruptive and was preventing them from peaceably attending church.

-10-

An associate pastor at Westminster testified that "[f]ive to six foot images of decapitations and mutilations are held in [parishioners'] faces, placed against their family vehicles, and directed at them at a close range . . . . Statements about [fetuses] being murdered, killed, and butchered by a member of their church [Dr. Crabb] are shouted at them as they enter the church building." J.A. at 117.

Westminster members testified that their families, and especially young children, have undergone emotional distress because of the picketing. One nine-year-old member testified at the City Council hearing that "[t]his lady stuck a bloody baby picture right in my face and she was about two to three feet away. My tummy was queasy and it was horrifying. I have had some bad times in my life, but that time was the worst ever." Id. at 122. Several churchgoers testified that their children experienced nightmares, frequent crying, and a negative shift in attitude towards church in general. See id. at 123. Psychologists testified that the children of Westminster were the most vulnerable to the picketers' signs and shouting. One psychologist testified that:

> Frankly, I was shocked by the atmosphere I encountered as I drove around the church. There was a siege like atmosphere with protestors strategically positioned around the church. . . . I had no idea the posters were so large or that the pictures were so graphic. The images on the poster are truly the images of nightmares. . . . As an expert in anxiety, I have little doubt that the experience of attending church at Westminster is highly stressful.

Id. at 130-31.

In some instances, members have taken dramatic measures to avoid the demonstrators. According to one church member, "Our six year old niece was forced to ride on the floorboard of her car for protection while arriving for the service." Id.

at 130. While some have done their best to circumvent the demonstrations, some have left the church because of the picketing. See id. at 123.

The Lincoln City Council ultimately enacted an ordinance that banned focused picketing on the sidewalks and entryways adjoining religious premises. The ban is effective thirty minutes before and thirty minutes after any scheduled religious activity. The purpose of Lincoln's ordinance was to "preserve the peace at religious premises . . . ." J.A. at 173. In addition, the Lincoln City Council believed that picketing in such a "time, place and manner as to disrupt religious activities or to hinder reasonable access to them by families with young children, disturbs the peace essential to individuals who wish to participate in such religious activities . . . ." Id. The City Council also found that:

> infants and young children are emotionally vulnerable to focused picketing in close proximity to them, which is a typical characteristic of focused picketing at religious premises, and many of these children tend to react with fear, unhappiness, anxiety and other emotional disturbance when such activity is imposed upon them. Families with infants and young children who must pass through the ring of focused picketing in order to attend or leave religious activities are for [sic] the time of entrance to the time of departure, captive audiences. Their option of foregoing their worship or other religious activity on the one hand, or risking pain and injury to their children on the other, amounts to a substantial and intolerable burden on their personal religious freedom. The technique of using focused picketing to disturb the very young so their families will feel coercion either to comply with picketers' wishes or forego their chosen religious activity entirely, is a pernicious and contemptible form of harassment.

Id. at 174.

The plaintiffs are four individuals who oppose abortion and have peacefully picketed outside Westminster. There are no allegations that these four plaintiffs have

-12-

ever carried graphic signs or have directed their protests toward children. The plaintiffs admit, however, that other protestors have carried signs containing "graphic photos of abortion." J.A. at 139. Two days after the ordinance was passed, the plaintiffs filed a complaint in federal district court seeking to have the ordinance declared unconstitutional. The district court issued a preliminary injunction against the ordinance's enforcement, and this appeal followed.

## II.    DISCUSSION

The Supreme Court has declared that "[a] State or municipality may protect individual privacy by enacting reasonable time, place, and manner regulations applicable to all speech irrespective of content." Erznoznik v. City of Jacksonville, 422 U.S. 205, 209 (1975). Nothing in the Constitution leaves localities powerless to legislate "to protect the public from the kind of boisterous and threatening conduct that disturbs the tranquility of spots selected by the people either for homes, . . . or for public and other buildings that require peace and quiet to carry out their functions, such as courts, libraries, schools, and hospitals." Gregory v. Chicago, 394 U.S. 111, 118 (1969) (Black, J., concurring). Local governments may enforce time, place, and manner restrictions on expressions that are content neutral, are narrowly tailored to serve a significant government interest, and leave open ample alternative channels of communication. See United States Postal Serv. v. Council of Greenburgh Civic Ass'ns, 453 U.S. 114, 132 (1981).[2]

---

[2]The majority, like the District Court, did not rule on the content neutrality of the ordinance, but instead assumed that it was content neutral. That issue is not disputed here. I add that it is also undisputed that the ordinance regulates speech in a traditionally public forum. See, e.g., Carey v. Brown, 447 U.S. 455, 460 (1980) (sidewalks historically associated with First Amendment rights).

-13-

## A. *Significant Government Interest*

It must be determined whether the government has a significant interest in protecting individuals who attend religious rites and observances from unwanted messages during those rites and observances. While this precise issue is one of first impression in this circuit, Frisby v. Schultz, 487 U.S. 474 (1988) provides the precedent for which to decide this important question.

In Frisby, the Supreme Court upheld a content-neutral ordinance that prohibited picketing in front of an individual's home. The purpose of that ordinance was to protect and preserve the sanctity of the home by ensuring that people could "enjoy in their homes and dwellings a feeling of well-being, tranquility, and privacy." Id. at 477. The Town Board of Brookfield, Wisconsin, which had enacted the ordinance in Frisby, believed that the ban was needed because "the practice of picketing before or about residences and dwellings causes emotional disturbance and distress to the occupants . . . ." Id.

In upholding the ban, the Court found that the ordinance served a significant government interest. It recognized that protecting the well-being, tranquility, and privacy of the home was a goal of the "highest order" and that "'preserving the sanctity of the home, [the place in which] men and women can repair to escape from the tribulations of their daily pursuits, is surely an important value.'" Id. at 484 (quoting Carey v. Brown, 447 U.S. 455, 471 (1980)). In deciding the case now before us, the issue is whether similar interests are present here, and, if so, whether those interests warrant similar methods of protection.

In Frisby, the Court recognized that preserving the well-being, tranquility and privacy of the home was a significant interest. See Frisby, 487 U.S. at 484. An important aspect of residential privacy, according to Frisby, was protecting the unwilling listener. See id. The Court noted that "in many locations, we expect

-14-

individuals simply to avoid speech they do not want to hear . . . ." Id. Nevertheless, the fact "[t]hat we are often 'captives' outside the sanctuary of the home and subject to objectionable speech . . . does not mean we must be captives everywhere." Id. (quoting Rowan v. Post Office Dep't, 397 U.S. 728, 738 (1970)) (omission in original). As a result, the Court found no right on the part of picketers to "force speech into the home of an unwilling listener." Id. at 485.

The government's interest in preserving the right of churchgoers to attend religious services free from substantial interference is strikingly similar to the interest in preserving the privacy of the home noted by the Frisby Court. One of our sister circuits recently held, also in the context of a content-neutral ordinance, that the government has a legitimate interest in protecting churchgoers from harassment and ensuring their access to church premises. See Edwards v. City of Santa Barbara, 150 F.3d 1213 (9th Cir. 1998), cert. denied, 119 S. Ct. 1142 (1999).[3] For the reasons that follow, I agree.

---

[3]In Edwards, the Ninth Circuit considered the validity of a content-neutral ordinance that prohibited all demonstration activity within a certain distance of health care facilities and places of worship. See Edwards, 150 F.3d at 1215. The Edwards panel held that government's interest in protecting persons engaging in worship from intimidation and harassment and its interest in ensuring access to places of worship was a sufficient government interest to sustain the ordinance. See id. at 1216. The court also held that the ordinance was narrowly tailored to ensure access to religious premises and left open alternative means of communication. See id. at 1217. See also Tompkins v. Cyr, 995 F. Supp. 664, 681 n.10 (N.D. Tex. 1998) ("The Court is troubled by the notion that a person may be subjected to focused picketing at their place of worship. Indeed, the right to engage in quiet and reflective prayer without being subjected to unwarranted intrusion is an essential component of freedom of religion. The government certainly has a significant interest in protecting this important First Amendment right.")

-15-

First, like the privacy of the home, the right of freedom to worship is one long-recognized by our society. The First Amendment protects this fundamental right from government interference. The Declaration of Independence recognizes it as an unalienable right that permits individuals to pursue happiness. This nation's history alone shows us that the fundamental right to worship is as important as the right to privacy within the home.

Second, the government has a significant interest in protecting the well-being and tranquility in a house of worship. Like the home, houses of worship—whether church, synagogue, or mosque—are sacred places where people seek rest and replenishment. Justice Black described the home as "the last citadel of the tired, the weary, and the sick . . . ." Gregory v. Chicago, 394 U.S. 111, 125 (1969) (Black, J., concurring). This description applies with equal force to houses of worship.

For Westminster's parishioners to attend their house of worship, they must listen to the unwanted and coercive messages forced upon them by the picketers. For those churchgoers, attending worship service is anything but tranquil. If members choose to attend religious services or activities, they must withstand the harassment and intimidation tactics of the protestors. Westminster members can either choose to attend church and endure the demonstrations, or they can stay home and forfeit their right to worship.

Third, the aspect of residential privacy that the Frisby Court found so important – the "unwilling listener" – is present here.[4] The members of Westminster are captives

---

[4]The notion that individuals should not be captives to unwanted speech is not a novel one, and government regulations that prohibit intrusive speech have been repeatedly upheld. See FCC v. Pacifica Found., 438 U.S. 726, 748-749 (1978) (offensive radio broadcasts); Rowan, supra (offensive mailings); Kovacs v. Cooper, 336 U.S. 77, 86-87 (1949) (sound trucks).

of unwanted speech as they attend their church, their religious home. "The First Amendment permits the government to prohibit offensive speech as intrusive when the 'captive' audience cannot avoid the objectionable speech." Frisby, 487 U.S. at 487. Here, the City of Lincoln has every interest in ensuring that individuals may exercise their religious beliefs free from intrusive and unduly coercive messages.[5] As such, just as the local government has a significant interest in protecting privacy within the home in Frisby, so too does the government of the City of Lincoln in protecting the fundamental rights of individuals to practice their religion undisturbed in the church of their choice.

## B.    *Narrowly Tailored*

Even if an ordinance serves a substantial government interest, it must be narrowly tailored to achieve that interest. See Perry Educ. Ass'n v. Perry Local Educators' Ass'n, 460 U.S. 37, 45 (1988). In Frisby, the Court held that the ordinance in question there was narrowly tailored because it prevented only focused picketing in front of a particular residence. Because the ordinance targeted and eliminated "no more than the exact source of the 'evil' it [sought] to remedy[,]" it was sufficiently narrow. Frisby, 487 U.S. at 485 (quoting City Council of Los Angeles v. Taxpayers for Vincent, 466 U.S. 789, 808-10 (1984)). The Court found that the picketers "generally [did] not seek to disseminate a message to the general public, but . . . intrude[d] upon the targeted resident, and . . . [did] so in an especially offensive way." Id. at 486. In

---

[5]Even Justice Brennan, who dissented in Frisby, recognized that "[w]ithout question there are many aspects of residential picketing that, if unregulated, might easily become intrusive or unduly coercive." Frisby, 487 U.S. at 494 (Brennan, J., dissenting). Justice Brennan noted that the protestors in Frisby trespassed and warned young children not to go near the house of the abortion doctor because the doctor was a "baby killer." Id. "Surely it is within the government's power to enact regulations as necessary to prevent such intrusive and coercive abuses." Id.

directing their message to a particular resident, the picketing had a "devastating effect . . . on the quiet enjoyment of the home . . . ." Id.

The same is true here. Lincoln's ordinance restricts focused picketing in a very limited way. From one-half hour before to one-half hour after religious services or activities, the protestors must not picket on the adjoining sidewalk and entryways to the church. The picketers are free to leaflet and to give anyone a leaflet if that person will accept it. The picketers may demonstrate as much as they wish across the street so long as they do not interfere with the religious service.

Given these limitations, this ordinance is far more narrow in its application than was the ordinance in Frisby. There, all picketing was banned at all times in front of a residence. Here, the ordinance applies only to those limited times immediately before and after a religious service or activity. In addition, only large demonstrative materials such as placards, banners or signs are prohibited. The ordinance targets only those places and forms of communication that are likely to have a coercive effect on the churchgoer—the placards that are held up to the faces of all the churchgoers, rested upon family vehicles, and targeted at the parishioners, at a very close range, as they enter and exit the church. All other communication and speech by the protestors is permitted. In light of Frisby, this ordinance is narrowly tailored.

The majority concludes that the ordinance is overbroad because it restricts all picketing, regardless of what the signs communicate or depict, and as such the regulation is not narrowly tailored to protect young children. The ordinance is also overbroad, according to the majority, because it regulates communication with adults. The majority states that the City of Lincoln is not justified to pass an ordinance simply because "adults attending Westminster Presbyterian Church probably do not like the signs and disagree with them." In so stating, the majority characterizes opposition to the picketers as based on a simple disagreement with the message conveyed or a mere dislike for the signs.

-18-

But the record clearly shows that the adults are affected in a much more acute way than by mere disapproval of the signs. To attend the church of their choice, those adults must listen to jeering shouts and view graphic images, as large as six feet, of decapitations and mutilations. See J.A. at 40 n.7. The parishioners' concerns about the effects of the picketing are more than just disagreement with the message. They must listen to messages that are intended to cause all churchgoers, adults and children alike, psychological distress. As Justice Stevens stated in Frisby, "picketing for the sole purpose of imposing psychological harm on a family" is not constitutionally protected. Frisby, 487 U.S. at 498 (Stevens, J., dissenting). Lincoln's ordinance prohibits only that limited range of speech that is likely to impose harmful psychological impact. In this respect, the ordinance reaches no more speech than is necessary to prevent the evil. Lincoln's ordinance is narrowly tailored.

## C.  *Alternative Channels of Communication*

The next issue is whether the Lincoln ordinance leaves open ample alternative channels of communication. As noted above, the ordinance prohibits the use of banners, placards, signs or other demonstrative materials. In this respect, it is similar to the ban in Frisby because it prohibits only a discrete type of expression. In Frisby, "focused picketing taking place solely in front of a particular residence" was prohibited. Id. at 483. The Frisby Court found that protestors were not "barred from the residential neighborhoods. They may enter such neighborhoods, alone or in groups, even marching . . . . They may go door-to-door to proselytize their views. They may distribute literature in this manner . . . or through the mails." Id. at 484 (omissions in original). The same is true here. The picketers may protest as much as they wish across the street, or anywhere else for that matter, except in the limited areas set forth in the ordinance. In addition, they may also picket directly on the sidewalks abutting houses of worship, provided they do so at times other than those proscribed. The plaintiffs have more than ample alternatives to express their views.

### D.     *Action v. Gannon*

Finally, I disagree that Action v. Gannon, 450 F.2d 1227 (8th Cir. 1971), compels a holding that the Lincoln ordinance is unconstitutional. In that case, members of the Black Liberation Front entered a cathedral on numerous occasions. They engaged in various demonstrations within the church including marching down the aisles, using amplifiers to communicate their "demands," approaching the lectern to speak to the congregation, and blocking communion rails. Id. at 1229. The district court issued a permanent injunction that prevented them from interrupting or disrupting services.

This court held that the defendants had no right to enter the cathedral and disrupt services because such disruption was an "intolerable violation of the rights of those engaged in worship." Id. at 1233. The court held that the plaintiffs were "clearly entitled to injunctive relief because the evidence established that the defendants had disrupted religious services at the cathedral and that they would continue to do so unless enjoined" id. at 1238, but held that the injunction must be revised so as to not deprive the defendants of their First Amendment rights. Id.

Action dealt with a different question than the one before us. At issue there was whether the defendants could be enjoined from entering a cathedral and disrupting services. This court held the district court could enjoin them. The court, however, revised the injunction to preserve the defendants' right to protest. In this case we consider whether it is within the government's power to enforce time, place and manner restrictions on demonstrations near religious premises to protect the churchgoers' First Amendment rights of freedom of assembly and worship.

In any event, Action supports the holding I reach. Action stands for the proposition that individuals shall not interfere with the free exercise of religion. It serves as a basis in this case to allow the government to prevent the interference of

those entering and leaving the church. In this respect, <u>Action</u> supports a holding that the ordinance is constitutional.

I add this final comment. The ordinance in question applies to all who violate its terms. Obviously, it would be impossible to write a content-neutral ordinance that drew a line between signs with graphic, bloody images as carried by some protestors and informational messages as carried by others. The plaintiffs here as peaceful picketers, which they claim they are, really face little restriction on their activities. At all times they may walk on the sidewalk and entryways to church property, distribute leaflets expressing their views, and ask to speak to those in the vicinity who are willing to listen to them. They also may carry signs and banners except at very limited times, that is, from one-half hour before to one-half hour after a scheduled activity or service.

This minor limitation on the plaintiffs' activities pales in comparison to the incivility, invasion of tranquility, and intimidation tactics visited upon those seeking to enter the church of their choice. That interference should not be countenanced.

The Lincoln ordinance bans speech directed principally at those unwilling listeners attending church services or activities. The government's interest here is substantial, the nature and scope of the ordinance make the prohibition narrowly tailored, and the protestors retain ample alternative channels of communication. The City Council of Lincoln has enacted a wise and fair ordinance. In declaring the ordinance unconstitutional, the majority of this court disregards the rights of churchgoing parents and children who suffer intimidating tactics from some protestors. They should not be required to face such a gauntlet. Therefore, I strongly dissent.

A true copy.

Attest:

          CLERK, U.S. COURT OF APPEALS, EIGHTH CIRCUIT.